(No. 51870.—■■■■■■■■■■■■■■■■)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. DENNIS WILLIAMS, Appellant.

*Opinion filed November 18, 1982.—Rehearing denied January 28, 1983.*

310

Ralph Reubner and Steven Clark, Deputy Defenders, and Martin Carlson and Richard E. Cunningham, Assistant Appellate Defenders, of the Office of the State Appellate Defender, of Chicago, for appellant; and Dennis Williams, *pro se.*

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Melbourne A. Noel, Jr., Assistant Attorney General, and Michael E. Shabat and Joel A. Stein, and Kevin Sweeney, Assistant State's Attorneys, all of Chicago, of counsel), for the People.

JUSTICE UNDERWOOD delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Dennis Williams was convicted of two counts of murder, two counts of aggravated kidnaping, and rape. A separate sentencing jury found the necessary aggravating factors and that there were no mitigating factors sufficient to preclude imposition of the death sentence. The court accordingly sentenced defendant to death for the murders and to concurrent extended terms of 60 years for the other offenses.

Defendant appealed directly to this court pursuant to article VI, section 4(b), of our 1970 constitution, and on April 16, 1982, we filed an opinion in which we affirmed defendant's convictions and death sentence over his objection, *inter alia,* that he was denied the effective assistance of counsel. While Williams' petition for rehearing was pending, a disciplinary case involving his attorney, Archie Benjamin Weston (*In re Weston* (1982), 92 Ill. 2d 431), was orally argued in this court. As a result of the additional information with which we were presented, of which we had been unaware during the preparation and filing of our *Williams* opinion, we directed the clerk of this court to forward copies of the record, briefs and taped argument in *In re Weston* to counsel for both sides in *Williams.* We then requested and subsequently received suggestions from the attorneys concerning the possible relevance of the disciplinary matters to the capital case. We thereafter allowed Williams' petition for rehearing.

Williams and codefendants Willie Rainge and Kenneth Adams were charged by information with the aggravated kidnaping and murders of Larry Lionberg and Carol Schmal, the rape of Carol Schmal, armed robbery, and armed violence. Another codefendant, Paula Gray, was indicted several months later for the same murders

and rape and for perjury. Mr. Weston represented Williams, Rainge and Gray; Adams retained separate counsel. The four were tried in September and October 1978 in one courtroom by two separate juries. One jury heard evidence relevant only to defendants Williams, Rainge and Adams, and the other jury heard evidence relevant only to Gray. Both juries heard evidence relevant to all four defendants. The procedure was suggested by the State because Paula Gray had made statements inadmissible against the others under *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. The substance of the *Bruton* problem was also the basis of the perjury charge against Paula Gray. She had given sworn testimony to a grand jury implicating the other three defendants in the abduction, murders and rape. However, at their preliminary hearing she recanted her grand jury testimony under oath, claiming that the police had forced her to tell a "lie" to the grand jury. The State intended to use these statements in its case against Gray but realized that under *Bruton* they were inadmissible against Williams, Rainge and Adams.

Williams, Rainge, Adams, and Gray were convicted of murder and rape, Williams and Rainge were also convicted of aggravated kidnaping, and Gray was convicted of perjury. Williams and Rainge requested a new sentencing jury, which returned a death penalty verdict on February 6, 1979, against Williams. Rainge was sentenced to concurrent terms of natural life imprisonment for the murders and to extended terms of imprisonment for the other offenses. Adams was sentenced, after a bench hearing, to extended terms of imprisonment, and Gray, in a later hearing, was also sentenced to extended terms of imprisonment. Those convictions have been affirmed. *People v. Gray* (1980), 87 Ill. App. 3d 142, *cert. denied* (1980), 445 U.S. 944, 63 L. Ed. 2d 777, 100 S. Ct. 1340; People v. Rainge and Adams (1st Dist. June 7,

1982), No. 79—565 (petition for rehearing pending).

In *In re Weston,* the Hearing Board and Review Board of our Attorney Registration and Disciplinary Commission both recommended that respondent, Archie Weston, be disbarred because of misconduct involving his handling of the estate of his client, Ella C. Graham, who died intestate in 1974. In April 1978, a son of one of the heirs complained to the Attorney Registration and Disciplinary Commission. Respondent was informed of the complaint, and the Inquiry Board forwarded a copy of the complaint to the judge of the probate division of the circuit court of Cook County. In August, a rule was issued by that court upon respondent to show cause why he should not be held in contempt of court. After securing a continuance, respondent failed to appear in probate court in November 1978 and was removed as administrator. He was subsequently adjudged in contempt of court. (That order was later quashed after partial payment of amounts which the court had found owing.) The administrator *de bonis non* also filed a petition to surcharge respondent for waste and neglect, and a judgment for $23,000 was thereafter entered against him, apparently resulting in a sheriff's sale of his home.

The Hearing Board found that respondent neglected legal matters entrusted to him, that he committed acts prejudicial to the administration of justice and acts which intentionally caused damage and prejudice to his client, and that he commingled and converted a client's funds, all in violation of various disciplinary rules of the Illinois Code of Professional Responsibility. Respondent neither answered the disciplinary complaint nor appeared to defend himself. The allegations of the complaint thus stood admitted, and we held them adequately supported by the evidence. We accordingly ordered that respondent be disbarred. *In re Weston* (1982), 92 Ill. 2d 431.

Williams urges that the matters disclosed by the record and proceedings in *In re Weston* provide further support for his contention that he was denied the effective assistance of counsel, whereas the State submits that the evidence of counsel's performance in an unrelated matter is irrelevant to the question of counsel's effectiveness in the capital case. We agree that ordinarily the record of counsel's performance at the trial in which his performance is questioned is the only relevant consideration in determining whether his client was afforded the effective assistance of counsel. We believe, however, that, in the unique circumstances of this capital case, fundamental fairness requires us to examine the additional information now before us concerning counsel's misconduct and the events occurring during the same period that he represented three defendants in a capital case to determine whether it has any bearing on the quality of that representation. We consider first, however, whether the evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

Resolution of factual disputes and the assessment of the credibility of the witnesses, is, of course, for the jury (*People v. Carlson* (1980), 79 Ill. 2d 564, 583; *People v. Zuniga* (1973), 53 Ill. 2d 550, 559), and we will not reverse a judgment of conviction unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to the guilt of defendant remains (*People v. Lewis* (1981), 88 Ill. 2d 129, 151; *People v. Carlson* (1980), 79 Ill. 2d 564, 583; *People v. Clark* (1972), 52 Ill. 2d 374, 387).

The evidence showed that Larry Lionberg worked a night shift at a gas station at 180th Street and Halsted near Homewood. He was visited there by his fiancee, Carol Schmal, and another couple. Larry and Carol were last seen by their friends about 2:15 a.m. on May 11, 1978, although Larry apparently made a call to a former

employer from the station about 2:30 a.m. At 6:30 a.m., the owner arrived at the station and found it unattended, open and ransacked. Some money and merchandise valued at $300 were missing. Police were called. Carol's car was found at the station; her purse was on the front seat.

The victims' bodies were found on May 12 at about 10:30 a.m. in East Chicago Heights. The investigating officer, P. J. Pastirik, testified that Larry was found face down in a nearby field, shot in the head twice and the back once. Carol was found in an upstairs room of a nearby abandoned townhouse at 1528 Canon Lane. Carol, also face down, had been shot twice in the head. She was clothed in knee-socks and a partially removed sweater and brassiere, and lying on a pair of jeans. A piece of plywood was covering the lower part of her body. The investigating medical officer said that she had been shot where she was found but could not say with certainty that Larry had been. Tests run on a vaginal swab taken from Carol at that time indicated that she had had intercourse within the past 36 hours. There was no trauma to the vaginal area; no foreign pubic hairs were found. Neither Carol's boots nor the murder weapon was recovered. Testimony indicated that bullet fragments recovered from each body had been fired from the same gun. Powder burns around Carol Schmal's wounds indicated the weapon was fired from a distance of six to 12 inches.

While Officer Pastirik was at the scene the substance of two anonymous calls was relayed to him. The calls came from an unidentified male with a "black voice" who said that the people who committed the murders were at the scene of the investigation. He also described a red Toyota and gave a license number reported to the officer as GA 1390. It is unclear whether the caller connected this number with the red Toyota. Officer Pastirik

testified that as he and a partner walked towards a rather large crowd that had gathered, two black men began walking briskly away. The men were stopped and questioned when they reached a red Toyota parked nearby. Dennis Williams, Verneal Jimmerson and the car were taken to the station. Williams was never released. (The charges against Jimmerson were dropped when Paula Gray recanted her testimony at the preliminary hearing.) Defendants Rainge and Adams were questioned later that evening but were released; however, Adams' car, a beige Toyota bearing plates numbered GX 1390, was held.

The following day, May 13, Officer Pastirik interviewed Charles McCraney, who lived on Hammond Lane in East Chicago Heights. He admitted to making the anonymous phone calls and identified both cars as those he had seen in the early morning hours of May 11. At this time, or shortly thereafter, McCraney also told the police what he had witnessed on the 11th but said he would not identify anyone until the police promised to relocate him. He eventually identified all four defendants as people he had seen in the early morning hours of May 11, near 1528 Canon Lane.

That evening Officer Pastirik interviewed Paula Gray and her sister, Paulette, who had come to the station with their mother. The substance of the conversation with the Grays was not admissible in the male defendants' trial, but it was at this time that Paula first told her story to police. Her mother was apparently present during some of the questioning. According to Pastirik's testimony, which did come out at the sentencing hearing, Paulette Gray told him that Paula had told her and her mother about the murders on the morning of May 11. Paula apparently went with police to the scene later that night to point out where the gun was thrown in the creek and where Carol Schmal's boots were put. They

were never found. Later that evening Rainge and Adams were taken into custody and an assistant State's Attorney from the Felony Review Unit questioned the male defendants and the Gray sisters. A few days later Paula Gray gave grand jury testimony substantially the same as the story she told Officer Pastirik. However, as earlier noted, at the preliminary hearing for the male defendants, she recanted. She was indicted on September 1 and retained Williams' counsel to represent her. Jury selection began on September 14.

The State's case included testimony by one parent of each of the victims, who testified as a "life and death" witness. The owner of the gas station and the friends who had last seen the victims placed the time of abduction as between 2:30 and 6:30 a.m. on May 11. Various police witnesses testified about discovering the bodies and receiving the anonymous phone calls.

Charles McCraney testified before both juries. He stated that as of May 11 he had been a resident of 1533 Hammond Lane for about two weeks. From a vantage point in one upstairs room he could see his car parked on Hammond Lane as well as several other cars which were at various times parked about 10 feet away from his, in front of Paula Gray's home at 1525 Hammond Lane. From a window on the other side of his home he could see across a courtyard to an abandoned townhouse at 1528 Canon Lane, where the body of Carol Schmal was later found.

McCraney testified that on the night of May 10-11 he was home playing his guitar and rehearsing music. Because he was worried about the "teenagers" in the street possibly tampering with his car, every 15 minutes or so he would go upstairs to look out his window and check on it. Continuously parked in the street near his car, from about 11 p.m., were a blue Chevrolet and a beige Toyota (Adams'). At various times a yellow Vega

(Rainge's) and a red Toyota (Williams') were also there. Some time between 2:30 a.m. and 3 a.m. the red Toyota appeared and parked next to the Chevrolet and beige Toyota. Within a few minutes the yellow Vega drove up very fast. McCraney saw the red Toyota then drive to the street light by his car; the driver, whom he identified as Williams, got out and broke the light. Williams then returned to the parked cars and picked up the driver of the Vega, whom McCraney identified as Rainge, and drove off.

McCraney, now more worried about his car, went out to check on it. He saw Paula Gray and an unidentified man sitting in the Chevrolet. He did not "pay attention" to the beige Toyota and returned to his music. Within a few minutes he heard a car revving its engine in the courtyard, and he returned to his upstairs window. The red Toyota was stuck in the mud near 1528 Canon Lane. From his other window he saw four people leave the beige Toyota and run, some through an abandoned building or through the courtyard, toward 1528 Canon. He identified Adams as one of the group. The red Toyota was now freed; Williams and Rainge got out and joined the group, now six to eight people, and entered the building at 1528 Canon. He said that he saw no women nor any "white people" in this group.

McCraney, feeling his car was now safe, paid no further attention to the activity outside, but about 1½ hours later he heard a shot from the direction of the townhouse the group entered. He had heard shots in that neighborhood frequently and took no action. During daylight, a few hours later that morning, he saw Williams again pull up to the now-broken street light and kick the glass out of the street.

The next day McCraney saw Williams in the crowd that had gathered in the field around the body of Larry Lionberg. McCraney said Williams was asking people

there, jokingly, whether they had shot "those people." He overheard him say, again jokingly, "I saw them jump when they shot them." This was prior to Carol Schmal's body being found. When it was found, McCraney put "two and two together" and made his anonymous phone calls.

David Jackson was called to testify about a conversation between Williams and Rainge that took place on May 15. Jackson overheard these two talking in a cell in the intake section of the Markham police station. Jackson, who had been arrested for burglary, was in the cell with Williams, Rainge, Adams and Jimmerson. Williams and Rainge were talking; the other two sat apart on the other side of the cell. Jackson said that Williams and Rainge each admitted to having had sex the night before and that they "really shouldn't have took it from the lady." Later Williams told Rainge he was "glad he took care of the guy" because "he kept running off with his mouth." He reassured Rainge not to worry because "they're gone" and "the piece" would never be found. Williams also said he would have to "get somebody to take care of the lady that seen them in the neighborhood the day they got arrested." On cross-examination, Jackson said Adams and Jimmerson did not take part in the conversation. He also said that he had a grudge against Williams and Rainge because his wife had, some time before, identified them as the two who had stolen a television from her at gunpoint and roughed up his kids.

The balance of the State's case dealt with physical evidence. Tests run on the vaginal swab showed seminal fluid from a person with type A blood. They also indicated the possibility of intercourse with persons having type A blood with a trace of " 'H' substance," and, possibly, type O blood. This indicated that Carol Schmal had had intercourse with someone who secreted these blood types in their body fluids. Williams had type A blood;

Adams had type A with a slight trace of " 'H' substance"; Rainge had type O blood. All three secreted their blood types in their body fluids. Carol Schmal also had type O blood, as did Larry Lionberg, but it was impossible to tell if either of them was a "secretor." However, if Carol was, this could explain the positive test for O type blood or for A type with " 'H' substance." It does not appear, however, that it would account for the positive test for type A blood.

Three hairs were also admitted into evidence. These were taken from Williams' car, two from the back seat and one from the trunk. The hairs were said to be from Caucasians. There were no dissimilarities between one of the hairs from the back seat and one from the trunk and the hair of Carol Schmal. The other hair from the back seat equally matched the hair of Larry Lionberg. The expert who testified said he could not say with certainty that the hairs in fact came from the victims. On redirect examination he said that in a Royal Canadian Mounted Police study of relatives, it was found that there was a 1 in 4,500 chance that similar hairs, that is, hairs matching in 99.9% of their characteristics, came from different heads. The expert testified that it would be less likely that matching hairs would come from different heads among the general population, but he refused to speculate about the odds when three similar hairs were found.

Before the State rested, the jury was taken out to the East Chicago Heights neighborhood, over defense objection, to view the scene. The trip was taken during the day for the safety of the jury. When they returned the State recalled Officer Pastirik to testify about changes in the area since the day of the murders. At the close of the State's case the court denied defense motions for directed verdicts.

Williams, Rainge and Adams presented alibi defenses. Williams said he got home about 1:30 a.m. after taking

Jimmerson and his family to Chicago. He said he stopped just before going home, for about five minutes, to talk to Adams and Gray, whom he found in Adams' car parked in front of Gray's home. He then went straight home and did not get up until about 9 a.m.

Rainge and his girlfriend both testified that they were together at Rainge's home with other members of his family (who were already in bed) until about 3:30 a.m. He also testified that on May 11 he worked from 9 a.m. until 7 p.m.

Adams' mother testified that her son was home asleep about 3:15 and he was still asleep at 7 a.m. when she got up. After Adams' attorney put two documents in evidence, one indicating that license number GA 1390 was registered to Virginia Miller of Galesburg, and the other indicating that there had been rainfall in the Chicago area in the morning hours of May 11, the defense rested.

In rebuttal, the State called two witnesses. Virginia Miller testified that she had owned a 1969 Toyota, license number GA 1390 in May of 1978; that in March of 1978 a license plate was lost or stolen; and that her car had not been in Cook County during May 1978 and for some time prior to that date. The State also called an 11-year-old boy (one of the boys who found Lionberg's body) who testified that at about 5 p.m. on May 11 he had seen Rainge in the field where the body was found. Closing arguments followed.

In our judgment the evidence warranted submission of the case to the jury. Although the evidence is in large part circumstantial, it does tend toward "a satisfactory conclusion" and produces "a reasonable and moral certainty" that the defendant committed the murders and rape. (*People v. Williams* (1977), 66 Ill. 2d 478, 485; *People v. Marino* (1970), 44 Ill. 2d 562, 580; *People v. Bernette* (1964), 30 Ill. 2d 359, 367; *People v. Magnafichi*

(1956), 9 Ill. 2d 169, 173; *People v. Fletcher* (1978), 72 Ill. 2d 66, 71.) As this court has often stated: " 'The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt.' " *People v. Foster* (1979), 76 Ill. 2d 365, 374, and cases cited therein.

The evidence, if believed by the jury, establishes that Williams and others were present in the area where the murders occurred and at the time they must have occurred. The jury was not bound to credit the alibi defense of Williams as against the eyewitness testimony which contradicted it. (*People v. Berland* (1978), 74 Ill. 2d 286, 307; *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 64; *People v. Jackson* (1973), 54 Ill. 2d 143, 149.) The circumstances of the disappearance of the victims, the places in which they were found, the state of undress of Carol Schmal, and the presence of seminal material that reacted positively to a test for type A blood indicate that they were forcibly abducted, that Carol Schmal was raped, and that Larry Lionberg and Carol Schmal were murdered. The net of circumstantial evidence tends forcibly toward a conclusion that Dennis Williams was among those responsible for the crimes. He was present at the time and place; his blood type matches that of one who raped Carol Schmal, hairs matching those of both victims were found in his car; two witnesses heard him make statements which suggested that he was involved in both the murders and the rape. Circumstantial evidence may be used to establish guilt (*People v. Williams* (1977), 66 Ill. 2d 478, 484; *People v. Bernette* (1964), 30 Ill. 2d 359, 367; *People v. Russell* (1959), 17 Ill. 2d 328, 331), and any inconsistencies or lack of "links" in this chain are at most minor. We believe, therefore, that the evidence, if believed by the jury

as it apparently was, was sufficient to prove defendant guilty beyond a reasonable doubt. Nevertheless, because of the newly acquired information concerning Williams' counsel, which we have concluded may well have had an effect on counsel's ability to represent his client in the trial of this capital case, we can no longer say, with any degree of assurance, that Williams received the effective assistance of counsel guaranteed by the Constitution. We accordingly conclude that he must be given a new trial.

Williams cites numerous instances of inaction by counsel to demonstrate that he was denied the effective assistance of counsel, including: the failure to make a motion to suppress the physical evidence seized from Williams' car—evidence which was perhaps crucial to the State's case; the failure to object to the testimony concerning the Canadian study on hair comparisons; the failure to object to prejudicial material received by Williams' jury which it is alleged was designed to insure that the jurors would know that Paula Gray had accused her codefendants; the failure to object to the rebuttal testimony of the 11-year-old boy; the failure to object to the information imparted to the jury concerning the manner in which its verdict would be reviewed; the failure to object to testimony concerning the good character of the decedents; the failure to demand a full evidentiary hearing for the purpose of discovering the existence of a written statement allegedly made by Charles McCraney within a few days of the murder; and the failure to make a motion for a new trial.

We originally examined, under our Rule 615(a) (73 Ill. 2d R. 615(a)), the more significant errors alleged to have occurred, notwithstanding the absence of objections and the failure to make a motion for a new trial, and found no plain error. We indicated that counsel's decision not to make a motion to suppress was perhaps an error in judgment, and that such errors do not establish incompe-

tency (*e.g., People v. Washington* (1968), 41 Ill. 2d 16,21; *People v. Green* (1967), 36 Ill. 2d 349, 351). However, we are now aware, for the first time, of the unique circumstances under which counsel in this case was operating at the time of the capital trial. In the light of these facts, we can no longer characterize counsel's decision not to make the motion to suppress the hair evidence or to take other action on his client's behalf as professional misjudgments made with full knowledge of the applicable law and the facts. Moreover, while we do not believe that the burden of defending three clients for capital murder before two juries, standing alone, necessarily reduced counsel's effectiveness, that fact in view of the new information now before us cannot be disregarded. In our original opinion we noted the additional burdens the simultaneous trials before separate juries placed on both the court and counsel, and for this and other reasons cautioned against their future use. That added burden, of course, accentuates the problems now posed.

It is apparent to us that the unique facts in this case require that we forgo application of either of the established tests, normally applied in determining whether a defendant has been deprived of his constitutional right to the assistance of counsel. (See, *e.g., People v. Lewis* (1981), 88 Ill. 2d 129, 153-54 (appointed counsel); *People v. Murphy* (1978), 72 Ill. 2d 421, 436 (retained counsel).) As we originally indicated, the voluminous record here shows that there were many instances where counsel made able and vigorous objections and presentations, and we cannot characterize his performance as actual incompetence or as of such a low caliber as to reduce the trial to a farce or sham. We believe, however, considering the unique circumstances and sequence of events in this capital case, which will rarely, if ever, be duplicated, that the interests of justice require that Dennis Williams be granted a new trial.

Accordingly, the judgment of the circuit court is reversed and the cause is remanded to that court for a new trial.

*Reversed and remanded.*