**UNITED STATES of America, ex rel. Paula GRAY, Petitioner-Appellant,**

v.

**DIRECTOR, DEPARTMENT OF CORRECTIONS, STATE OF ILLINOIS, Respondent-Appellee.**

No. 82–2940.

United States Court of Appeals, Seventh Circuit.

Argued May 25, 1983.

Decided Nov. 16, 1983.

Rehearing Denied Dec. 22, 1983.

Certiorari Denied March 26, 1984. See 104 S.Ct. 1690.

---

James H. Reddy, Asst. Public Defender of Cook County, Chicago, Ill., for petitioner-appellant.

Kevin Sweeney, Cook County Asst. State's Atty., Chicago, Ill., for respondent-appellee.

Before WOOD and CUDAHY, Circuit Judges, and WYATT, Senior District Judge.*

WYATT, Senior District Judge.

This is an appeal by Paula Gray ("Paula"), in custody of the respondent, Director, Department of Corrections, State of Illinois, from an order of the District Court dismissing on motion a petition for a writ of habeas corpus for failure to exhaust available state remedies. 28 U.S.C. § 2254(b). Paula was sentenced on February 22, 1979, in the Circuit Court of Cook County, Illinois, after a jury had found her guilty of murder, rape, and perjury; her part was that of an aider and abettor. The sentence was imprisonment for concurrent terms of 50 years each for two murders and for rape, and of ten years for perjury.

By order filed May 6, 1982, the District Court *denied* motion of respondent to dismiss the petition. The reasons for the denial are said in the order to have been "stated in open court". The record does not contain any transcript of what was "stated in open court".

The District Court later changed its decision. By order with opinion filed October 18, 1982, the motion of respondent to dismiss the petition was *granted* on the ground that Paula had not exhausted state remedies.

This appeal followed and, the District Court having issued a certificate of probable cause, there is jurisdiction in this Court of the appeal under 28 U.S.C. § 2253.

We reverse the order of dismissal of the District Court.

1.

On Thursday, May 11, 1978, related and revolting crimes were committed in Homewood and East Chicago Heights, Illinois. About five months later, three of the four men who committed these crimes and Paula, who aided and abetted them, were convicted by jury verdicts. One man was sentenced to death; one man was sentenced to life imprisonment; one man and Paula were sentenced to long prison terms. Almost five years later, the Illinois state courts and the federal courts are still dealing with these convictions. Because of Paula's perjury, one man escaped prosecution altogether.

In the early hours of May 11, 1978, a young man was abducted at gunpoint from a Homewood gasoline station where he was employed and which was robbed and looted. His fiancee, visiting him at his job, was also abducted. The two young people were taken some five miles away to an abandoned apartment, part of a housing complex where Paula and her family and Dennis Williams and his family lived as close neighbors. In the abandoned apartment, while Paula held a lighter for the men to see, the young woman was raped by Williams, Rainge, Adams, and Jimmerson; Williams then shot the young woman to death. The young man was next taken to a nearby

---

* The Honorable Inzer B. Wyatt, Senior District Judge for the Southern District of New York, is sitting by designation.

field, with Paula in attendance. Williams shot the young man twice in the head and handed his gun to Rainge who shot the young man in the back. Williams and Paula went to a creek close at hand where Williams threw away the gun which had been used. Williams at this point told Paula not to tell the police what she had seen or he would kill her and her family.

The bodies of the victims were found on Friday, May 12. Investigation led first to Williams and Jimmerson who were arrested near the place of the murders and taken to Homewood police station for questioning. In the evening of May 12 Adams and Rainge were also questioned at the police station. They and Jimmerson were released on the same evening, to be rearrested a few days later. Williams was never released.

### 2.

As to Paula, she was not subject to the death penalty under Illinois law because she was not 18 years old when the murders were committed. Ill.Rev.Stat. ch. 38, § 9–1(b). Williams, Rainge, Adams, and Jimmerson were each subject to the death penalty because they were above the age of 18 when the murders were committed.

### 3.

Paula, her mother, her twin sister, and five younger brothers and sisters lived at 1525 Hammond Lane in the housing complex already mentioned. Paula not only had known Williams and his family for some time, but had also known the other three men who were shown by the evidence to have committed the crimes.

Paula and her twin sister were born June 27, 1960, and were the only children of Mrs. Gray by a Mr. Love. As recited in the presentence report: "The defendant, her sister, and the other children were raised by their mother. The mother has been on Public Aid." (Record, Volume I, p. C 62). The affidavit of Paula, made to obtain assigned counsel after her sentence in February, 1979, recites that she then had no money and no other property of any description. It is evident from the record that Paula and her family were, and for some time had been, indigent.

The record contains a report on Paula from the Cook County Office of Special Education dated September 29, 1969. This gives her Wechsler Intelligence Quotient (IQ) as 65 verbal, 57 performance, 57 full. The report states that Paula has "limited intellectual capacities in really all spheres of function [and] continues to be in need of and to remain eligible for EMH classroom placement." (EMH is understood to be an abbreviation for "Educable Mentally Handicapped"). A similar report in the record, dated June 12, 1974, shows an IQ of 69 verbal, 67 performance, and 64 full, with continued EMH classification. These figures classify Paula as mentally retarded (Stedman's Medical Dictionary 1224 (5th unabr. law. ed. (1982)).

### 4.

On Saturday, May 13, Officer Pastirik and other officers went to 1525 Hammond Lane. They spoke to Paula for the first time. She was there with younger children, but neither her mother nor twin sister Paulette was at home. Pastirik told Paula that they were looking for a pair of woman's boots; she consented to a search and in a closet the officers found a pair of boots which Paula said belonged to her sister Paulette. They told Paula they were taking the boots, but when her mother returned, to ask her mother to telephone them. Paula said the Grays had no telephone. The officers then said that if her mother had any question about the boots or anything else to have her come to the police station.

### 5.

At about 7:30 in the evening of May 13, Paula, her mother, Paulette, and younger brothers and sisters, came to the police station by their own chosen transportation; no police officer brought them.

Two officers spoke to Paula in an office at the station. Although she was not in custody, one officer explained to Paula her constitutional rights, reading from a card for the purpose. She indicated ("made some vague statements") that she would talk to them. (T 1054; "T" references are

to pages of the stenographic transcript of the trial, which transcript includes also the suppression hearing which occurred during the trial). Paula "seemed scared" (T 1055). The officers asked her about this and she told them that "she was afraid of Dennis Williams" (T 1055–56).

The officers then left Paula, went to her mother and told her that Paula had information about the crimes but seemed frightened. The mother asked to see Paula. The officers took her to the office and left her alone with Paula. Some minutes later the officers went back to them and "Mrs. Gray said that Paula would cooperate" (T 1058). Mrs. Gray stayed with her and "kept saying [to Paula] to cooperate with the police" (T 1059). The officers asked who was there when the crimes were committed and Paula gave them the names of Williams, Adams, and Rainge; later she gave them the name of Jimmerson.

Meanwhile, Officer Pastirik had been talking to Paulette in another office. After a discussion, Paulette told the officer that Paula did know about the crimes, that Paula was present when they took place, and that Paula had told her (Paulette) about them on Thursday morning, May 11, about eleven o'clock, some seven or eight hours after they had occurred.

Pastirik then went with Paulette to the office where Paula and her mother were with the other two officers, who left. Pastirik, Paula, her mother, and Paulette remained. Paulette explained that she had told Pastirik "what happened, who shot them. I told him everything" (T 1219). She urged Paula: "for Mom, for everybody tell them everything" (T 1219). Then Paula told Pastirik "everything"; "Paula ran down the entire incident to me at that time" (T 1219). The information Paula told Pastirik was to become her testimony before a grand jury a few days later on May 16.

Mrs. Gray, the mother, confirmed that at the police station on May 13 she had told Paula "not to worry and just tell the police the truth" (T 1177). Paula herself admitted that her mother had told her "to trust the police and to tell them the truth" (T 978, 979).

About midnight May 13–14, Paula and three police officers went to the scene of the crimes. They looked at the apartment where the young woman had been raped and killed and Paula pointed out where the victim had lain. Paula showed them another empty apartment where she had been when she saw the arrival of Williams and others with the victims. Paula walked with the officers to the creek near where the young man was shot and Paula pointed out where Williams had thrown the gun into the water. They then returned to the police station.

While the officers were with Paula on the trip to the scene, she described the crimes to them. As to the disposal of the gun, one of the officers testified to what she said: "She explained that Dennis Williams took her to the creek to throw the gun in. Dennis held her by the hand real tight and made her go to the creek" (T 1085).

In the early hours of Sunday, May 14, a State's Attorney, DiBenedetto, arrived at the police station. About 3:00 a.m. he talked to Paula, her mother, and Pastirik in an office. Paula described the crimes to DiBenedetto and (again) to Pastirik, after which they left Paula and her mother. At about 7:30 in the morning of May 14, Sala (a police officer) drove Paula, her mother, and DiBenedetto to the Gray apartment in East Chicago Heights. They went into the nearby apartment where the young woman was killed but Paula seemed tired and the officers suggested that she and her mother go to their home and sleep, which they did.

### 6.

Paula and the Gray family had no further contact with the police investigators until late Monday afternoon, May 15, when Paula met with State's Attorney Johnson, State's Attorney Hardiman (a woman), and police investigators. Johnson was the senior and the coordinator. Paula appeared frightened and said that "she was afraid for the safety of herself and her family" (T 1158). The State's Attorneys told her that their

office could protect her and her family and could relocate them. They told her of her rights, including the right to counsel and that if she could not afford a lawyer, they could get one for her at the County's expense. They told her that she appeared herself to be involved in the crimes. Paula then told again how the crimes took place and who committed them. When she had finished, Johnson told her that he believed, from what she had said, that she was in jeopardy in the community where she lived from relatives of Williams, Jimmerson, Rainge, and Adams (all of whom by then were in custody). Johnson suggested that the State "put her up for the night" and thus "isolate her from that community" (T 1261). Johnson explained that he expected to have time the next morning before a grand jury and that he wanted Paula to repeat before the grand jury what she had told him about the crimes. Paula agreed that perhaps it would be best for her not to go back into the community at that time and to be put up overnight by the State. This was done, and it was arranged for her to stay the night of May 15 at the Holiday Inn at Harvey, a female officer "staying with and protecting" her (T 1262).

So far as the record shows, it was at this time (May 15) that the Gray family was first in touch with Archie B. Weston, the lawyer representing Williams, Rainge, and Jimmerson. This came out when Mrs. Gray was testifying (called by the State) at a suppression hearing during the trial. Under cross-examination by Weston, Mrs. Gray testified that on May 15, evidently in the early evening, she did not know where Paula had been taken. Weston asked Mrs. Gray when she learned where Paula was staying; her reply was: "That's when I got in touch with you" (T 1191). Weston dropped the subject at once. The State then questioned Mrs. Gray about her call to Weston. She would not say whether she knew Weston but said she had "heard quite a bit about him", that somebody had given her Weston's phone number, but that she couldn't remember who did so (T 1194). She further testified that "Mr. Weston had

made some phone calls and that's how we found out about Paula" (T 1195).

While the record does not make it certain, it seems reasonably clear that Weston was already on May 15 representing Williams, Rainge and Jimmerson as their attorney. Paula's mother on or before May 15 had been given Weston's phone number and was in touch with him. Weston had known what phone calls to make on May 15 to find out the motel where the State was keeping Paula.

It seems evident that if Mrs. Gray did not already know Weston by Monday evening, May 15, she had indeed "heard quite a bit about him". She had been at her apartment, out of touch with the police, since Sunday morning, May 14. The relatives of Williams were close by and they were keenly interested in Paula, the only eyewitness to the crimes except for the males who as principals committed them. If anybody gave Mrs. Gray the phone number of Weston, it must have been one of the relatives of Williams.

Police officers drove Mrs. Gray on the evening of May 15 to the Holiday Inn at Harvey and, after a visit with Paula, drove her home.

7.

On the next day, Tuesday, May 16, after breakfast, officers came to the Holiday Inn with Mrs. Gray who said: "Paula, just tell the truth" (T 1164). They all then went to the State's Attorneys' offices and Paula testified in the same building before the grand jury.

Paula testified under oath to what she had already told the police and State's Attorneys several times. In summary, she testified that she was with Adams in a car parked near her apartment from the evening of May 10 to the early hours of May 11; that she left him and went to her apartment; that she heard noise and looked out; that she saw Williams' car; that she went to a vacant house next to hers; that she was trying to hide; that she saw Williams, Jimmerson, and Rainge and "two people" (the victims) in the back of Williams' car; that Williams saw her, came to

her, took her by the hand, told her to come with him, to follow him; that she did follow him; that the "two people", a white man and woman, were made to go to 1528 Cannon Lane nearby, an abandoned apartment; that they took the woman upstairs; that Rainge stayed with the man; that Williams handed Paula a lighter and told her to light it and hold it; that she did so; that the three men already named plus Adams (who had reappeared) then raped the victim twice each (once for Adams); that Williams then shot the victim twice in the head; that Williams took Paula's hand and told them all to go downstairs; that Williams, Rainge, and she then went with the man near the creek, with Williams still holding Paula by the hand; that near the creek Williams shot the man twice in the head; that Rainge then shot him once in the back; that the three then walked to the creek and Williams threw the gun in the creek at the point she had shown the police; and that Williams told her not to tell the police and that if she did, he would kill her and her family. Paula further testified that she had told what happened to her mother, to her twin sister, to police officers, and to the State's Attorneys.

### 8.

After her grand jury testimony, Paula and her mother talked with Johnson, a senior State's Attorney, in an office in the same building. They discussed where Paula should stay, whether she should return to the community or be put up and protected as a witness for the State. Mrs. Gray and Paula consulted together, Mrs. Gray saying "repeatedly" to Paula "whatever you want" (T 1267). Paula finally decided and "indicated she wanted to go to the motel again" (T 1267). Mrs. Gray testified that "I just told them to take Paula because I didn't want anything to happen to Paula" (T 1192). Arrangements were made for Paula to stay that night, May 16–17, at a different motel, the Holiday Inn at Hillside, and she did stay there. The next day, May 17, Paula said she wanted to go back to her family; the police officers took her to the Gray apartment, 1525 Hammond Lane, in the housing complex.

Now, on May 17, Paula was back in the community and away from the protection of the State. It was now possible that she could be influenced to deny the truth of the testimony she had given to the grand jury and to the police officers and to refuse to give any further testimony which would incriminate the male principals, all but one of whom were represented by Weston.

### 9.

It was now arranged for Paula and her family to move in with the Williamses in their home. The Williams family itself did the moving (T 2259). It is not possible from the record to establish exactly when the Gray family moved in with the family of Williams, but it was sometime after Paula testified to the grand jury on May 16 and before the preliminary hearing on June 19, 1978 for the males accused. Paula admitted this as follows (T 2283):

> Q But it was sometime between the time that you went home from the Holiday Inn and when you came to the preliminary hearing with Mr. Weston, isn't that correct?
>
> A Yes.

According to the Appellate Court of Illinois in affirming the conviction of Paula, she and her family moved in with the Williams a "few days" after May 17 when she returned home from the Hillside Motel (408 N.E.2d 1150 at 1156).

It is evident from the record that Weston began to have contacts with Paula at about this time and that he was concerned with any further testimony by her concerning Williams, Rainge and Jimmerson. Exactly when Weston began to represent Paula as her attorney cannot be established from the record but the only reasonable conclusion is that Weston was advising her before the preliminary hearing on June 19.

### 10.

The State had arranged for Paula to testify as a witness for the State to show probable cause at the preliminary hearing on June 19 against Williams, Rainge, Adams, and Jimmerson. She came to the

courtroom for the hearing with Weston, counsel to three of the accused, and had walked up the steps to the courtroom, hand in hand with Weston. When she testified for the State, she flatly contradicted what she had told to police officers and to the grand jury; she swore that she knew nothing about the crimes committed on May 11 and that she had been forced by the law enforcement officers to lie. Without Paula's supporting testimony, the charges as to Jimmerson were dismissed for want of probable cause and he was released. Even without her testimony, the charges were sustained as to Williams, Rainge, and Adams.

Paula left the court building with Weston.

On July 3, 1978, an information was filed against Williams, Rainge, and Adams charging them with the crimes committed by them as principals on May 11, 1978.

On September 1, 1978, an indictment was filed against Paula for the crimes committed by her as aider and abettor against the two victims on May 11, 1978, and for the perjury committed on June 19, 1978, at the preliminary hearing. As was to be expected, Weston, on the day the indictment was filed, entered his formal appearance as attorney for Paula.

It may be noted that, in acting as attorney for Paula, Weston could expect to receive no compensation from Paula or her family. The record shows that they were all indigent, without property, and receiving Public Aid. Were Weston in prosperous circumstances, it might be reasonable for him to undertake a public service. But as will later be seen, Weston was himself in deep financial distress at the time. The only reasonable conclusion is that Weston acted as attorney for Paula primarily, if not entirely, to prevent her testifying against Williams, Rainge, and Jimmerson who—unlike Paula—faced the death penalty. Whether Weston in fact was paid by Williams or the others for representing Paula, does not appear of record.

11.

The trial began on September 14, 1978, with Weston representing Williams, Rainge, and Paula; another lawyer represented Adams. At the suggestion of the State, the trial was before two separate juries in the same courtroom, one jury for the charges against Paula, the other jury for the charges against Williams, Rainge, and Adams. Some evidence was heard by the jury for Paula, some by the other jury, and some by both juries. This method was designed, among other things, to avoid the problem that the incriminating testimony of Paula to the grand jury and her incriminating statements to others, while admissible against her, were not admissible against the male defendants (*Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)).

On September 29, during the presentation of the State's case, a motion was filed by Weston on Paula's behalf to suppress as evidence all statements, admissions, etc., of Paula, including her grand jury testimony on May 16. There were several grounds recited for the motion, such as failure to give *Miranda* warnings, coercion, etc. The motion falsely claimed that she was arrested on May 13. According to the arrest card in the record and all the other evidence, she was arrested on August 31, 1978.

The motion to suppress was heard, without the jury, on October 4. As indicative of the testimony Paula gave about police coercion of her to lie to the grand jury, the following may be noted (T 1025–26, emphasis supplied):

Q And, Paula, down there at the Grand Jury how was it that they made you lie to the Grand Jury? What did they do to you and who did it?

A Look, they forced me to tell a lie.

Q Who did?

A I know what I'm talking about. P.J. and all the rest of them and him too.

Q P.J. wasn't in that Grand Jury room with you, was he?

A They were standing outside of the Grand Jury.

Q   How did he make you tell a lie that day down at the Grand Jury?

[Colloquy and objection overruled]

MR. ARTHUR: Would you repeat the question.

(Record read by reporter)

THE WITNESS: *They was trying to be nice to me and everything and all that.  I don't take no niceness from no cops because I don't like them.*

At the conclusion of the hearing, the motion to suppress was denied from the Bench. The trial judge found, among other things, that Paula was "adequately and properly advised and warned" under the *Miranda* ruling; that Paula was "not under arrest"; that "no force was exercised, no promises; no threats, no harm was done"; and that she made her statements, including her testimony to the grand jury, " voluntarily" (T 1311–14).

The trial resumed.  The State completed its case in chief on October 16 (T 2136). The State then dismissed ten counts against Paula, leaving against her five counts charging murder, one count charging rape, and one count charging perjury.

The defense for Paula Gray was presented on October 18.  An investigative officer, called by Adams, testified apparently before both juries.  Then Paula testified before the jury in her case.  After her testimony, Weston rested her case (T 2308).

The State called a rebuttal witness on October 19 and rested its case.  There were no further defense witnesses.

Summations and the instructions of the Court were given on October 20.  The jury returned, on the same day, written verdicts of guilty against Paula Gray on the seven counts of murder, rape, and perjury.

Sentence was imposed on Paula on January 22, 1979.  The sentence was 50 years imprisonment for the murders and for rape and 10 years for the perjury, all sentences to run concurrently.  The trial judge found that the perjury was aggravated by a false claim that her original and truthful account of what happened was a lie forced on her by the law enforcement officers.

At the sentencing of Paula, Weston represented that she was indigent and provided a statement showing financial destitution. The Court appointed the Public Defender to perfect her appeal.

12.

At the close of the trial, the jury hearing the case against Williams, Rainge and Adams returned written verdicts of guilty on all counts submitted.

The State advised the Court that it would ask the death penalty on the murder counts against the three convicted male defendants.

Adams waived a jury for the separate sentencing proceeding.  Ill.Rev.Stat., ch. 38, § 9–1(d)(3).  Very long prison terms were imposed on Adams.

Williams and Rainge asked for a jury for the death sentence proceedings and that the jury be different from that at the trial. Ill.Rev.Stat., ch. 38, § 9–1(d).

The sentencing jury agreed unanimously that there were no mitigating factors to preclude the death penalty for Williams and Rainge and unanimously concluded that Williams should be sentenced to death.  The jury could not agree unanimously on the death penalty for Rainge.  The Court sentenced Rainge to life imprisonment for murder and to long prison terms on the other counts.

13.

On August 8, 1980, the Appellate Court of Illinois, First District, Fifth Division, affirmed the convictions and sentences of Paula.  87 Ill.App.3d 142, 42 Ill.Dec. 441, 408 N.E.2d 1150.

Appointed counsel, replacing Weston, argued on appeal that if Paula's statements and grand jury testimony are assumed to be truthful, whatever she did was forced by Williams and that, without any request, an instruction should have been given on the affirmative defense of compulsion.  The Court found that there was not sufficient evidence presented for Paula to support the

defense of compulsion or to justify an instruction on the subject.

Appointed counsel also argued that there was a violation of Paula's constitutional right to conflict-free counsel because Weston had an actual conflict of interest in representing Paula and also Williams and Rainge. The Court found that this argument required an assumption that Paula's "grand jury testimony was the truth and was known to be so by attorney Weston". 408 N.E.2d at 1157 The Court refused to make the assumption and found that there was "no proof of actual conflict". 408 N.E.2d at 1157 It may be noted that the conviction of Paula of perjury had established that her grand jury testimony was the truth.

On December 2, 1980, leave to appeal was denied by the Supreme Court of Illinois. 81 Ill.2d 604.

On March 30, 1981, *certiorari* was denied by the Supreme Court of the United States. 450 U.S. 1032, 101 S.Ct. 1745, 68 L.Ed.2d 228.

On August 11, 1981, with the Public Defender continuing as her counsel, the petition of Paula for a writ of habeas corpus— the petition now before us—was filed in the District Court.

### 14.

Williams prosecuted a direct appeal to the Supreme Court of Illinois, to which he was entitled as of right because he was under sentence of death. Ill. Const. art. VI, § 4. The Public Defender had been appointed to represent him.

On April 16, 1982, the Supreme Court of Illinois filed an opinion and decision affirming the judgment of conviction and sentence of death imposed on Williams. One justice dissented from the affirmation of the death sentence and one justice dissented from the affirmation of conviction. For reasons which will appear, this opinion was never published, but we have been furnished a copy by the Clerk of the Court.

One of the arguments made for Williams was that he did not have effective assistance of counsel and that the loyalty of Weston was divided by a conflict of interest between Williams and Paula. The Court rejected this argument on the ground that, after she charged her grand jury testimony at the preliminary hearing, any conflict which might have existed "disappeared" and that after the preliminary hearing the positions taken by Williams and Paula were "totally consistent". The Court pointed out a possible benefit to Williams from the dual representation by Weston of Paula, in that "had Gray been represented by other counsel, she might well have defended on grounds of coercion and become a witness against Williams".

On May 7, 1982, Williams filed a petition for a rehearing.

### 15.

While the petition of Williams for a rehearing was pending before the Supreme Court of Illinois, oral argument took place before that Court in a disbarment proceeding against Weston. The proceeding involved misconduct by Weston in the handling of the estate of a client, including conversion of funds. There had been a judgment against Weston and apparently a sheriff's sale of his home.

The information in the disbarment proceeding was new to the Supreme Court of Illinois, which caused the record to be sent to counsel on the Williams appeal and invited suggestions whether the disbarment proceedings were relevant to the Williams appeal. Thereafter, the Court granted the Williams petition for a rehearing.

### 16.

On June 7, 1982, the Appellate Court of Illinois, First District, First Division, filed an opinion affirming the convictions of Rainge and Adams. This opinion was later "revised" and it was never published as filed. We have not been able to obtain a copy of the opinion from the Clerk of the Court.

Rainge and Adams moved for a rehearing on their appeals, the disposition of which was contained in the June 7, 1982 opinion.

### 17.

On May 6, 1982, the District Court, as earlier noted, had denied the motion of the respondent custodian to dismiss the petition of Paula for a writ of habeas corpus.

On October 18, 1982, the District Court granted the motion of the respondent custodian and dismissed the petition of Paula for a writ of habeas corpus, thus changing the earlier decision.

### 18.

On October 22, 1982, the Supreme Court of Illinois filed an opinion in the disbarment proceeding against Weston; if found the charges of misconduct amply proved. A last-ditch motion by Weston to strike his name from the roll of attorneys was denied, primarily because of the "serious nature of the unprofessional conduct involved". The Supreme Court ordered Weston disbarred, 92 Ill.2d 431, 65 Ill.Dec. 925, 442 N.E.2d 236.

### 19.

On November 18, 1982, the Supreme Court of Illinois filed a second opinion on the appeal by Williams, 93 Ill.2d 309, 67 Ill.Dec. 97, 444 N.E.2d 136. The Court continued to find the evidence sufficient to prove Williams guilty beyond a reasonable doubt. But the Court did not affirm the conviction; instead the Court reversed and remanded to the Circuit Court for a new trial. The Court first explained:

[F]undamental fairness requires us to examine the additional information now before us concerning counsel's misconduct and the events occurring during the same period that he represented three defendants in a capital case to determine whether it has any bearing on the quality of that representation. 444 N.E.2d at 138.

After the examination indicated, the Court found that:

[B]ecause of the newly acquired information concerning Williams' counsel, which we have concluded may well have had an effect on counsel's ability to represent his client in the trial of this capital case, we can no longer say, with any degree of assurance, that Williams received the effective assistance of counsel guaranteed by the Constitution. 444 N.E.2d at 142.

The Court concluded:

We believe, however, considering the unique circumstances and sequence of events in this capital case, which will rarely, if ever, be duplicated, that the interests of justice require that Dennis Williams be granted a new trial. 444 N.E.2d at 143.

### 20.

On the same day, November 18, 1982, on which the Supreme Court of Illinois filed its opinion reversing the conviction of Williams, counsel for Paula filed a motion, on the basis of the decision as to Williams, for leave to file a motion for a supervisory order granting Paula a new trial or alternatively to reconsider Paula's petition for leave to appeal to the Supreme Court of Illinois.

On November 24, 1982, the Supreme Court of Illinois denied Paula's motion "without prejudice to petitioner to file a petition for post-conviction relief in the trial court".

### 21.

On February 22, 1983, on the appeals of Rainge and Adams, the Appellate Court of Illinois, First District, First Division, filed "the revised opinion of the court upon consideration of defendants' petition for rehearing" 112 Ill.App.3d 396, 68 Ill.Dec. 87, 445 N.E.2d 535, 537. The decision was different from that in the opinion filed June 7, 1982. The judgments of conviction of Rainge were vacated and the cause remanded for a new trial. The judgments of conviction of Adams were affirmed.

As to Adams, he could not rely on the argument of ineffective assistance of counsel or conflict of interest from multiple representation. It was this argument that had persuaded the Supreme Court of Illinois to order a new trial for Williams; but Adams had separate counsel who represented Adams alone.

As to Rainge, however, the situation was substantially the same as that of Williams.

Weston had represented them both. The Court concluded that the decision of the Supreme Court of Illinois in its second opinion concerning Williams ("*Williams II*") mandated a new trial for Rainge as well. The Court stated its conclusion (445 N.E.2d at 547):

We are of the opinion that the similar interests of Williams and Rainge and the similar issue raised on the same record require that defendant Rainge be granted a new trial. As in *Williams II,* we base our decision upon "the unique circumstances and sequence of events in this capital case which will rarely, if ever, be duplicated."

### 22.

We have recounted the history of the prosecutions in some detail so as to explain how the present state of affairs has come about. Five persons are shown by the evidence to have done the rape and killing on May 11, 1978. After the passage of more than five years, the conviction of only one of these (Adams) appears final; one (Jimmerson) has escaped even a trial; two (Williams and Rainge) must be retried; and the fifth—the least culpable, except for her perjury—is the appellant now before us.

### 23.

■ The record establishes that an actual conflict of interest existed between appellant Paula and her co-defendant Dennis Williams (for simplicity we limit our discussion to Williams) and that they were both represented by the same attorney. This was a violation of Paula's constitutional right to the assistance of counsel and entitles her to a new trial. "Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest". *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981).

While Paula was not indicted until September 1, 1978, the record leads us to conclude that Weston was advising Paula from a time after her grand jury testimony on May 16, 1978, and *before* her appearance with Weston, although to be a state's witness, at the preliminary hearing on June 19, 1978. It is not significant on this appeal as a matter of law whether Weston acted as attorney for Paula before her indictment and trial, but it is significant as a matter of fact because it shows the genesis of Weston's involvement with Paula and the results of that involvement.

Between May 13 and May 17, 1978, while she was in close touch with the police officers, kept by them at a motel for two nights and advised by her mother and twin sister to cooperate and tell the truth, Paula, as an eyewitness, made a number of statements and gave sworn testimony to a grand jury, seriously implicating Williams in the May 11, 1978, crimes, and implicating herself in the same crimes.

When she left police protection and returned to the community on May 17, 1978, Paula was a 17 year old, mentally retarded girl, in school classes for EMH (educable mentally handicapped) children, herself and family indigent, without any criminal record, and, as (at most) an aider and abettor, much less seriously implicated in the crimes than Williams, a principal. By reason of her age, Paula was not subject to the death penalty. Moreover, on her statements and testimony to the grand jury, she had the defense of coercion by Williams to do whatever she did and, if this defense did not prevail, it could have been urged for her that whatever she did was not sufficient to constitute her an aider and abettor.

An independent, conflict-free, competent attorney for Paula would at this point have carefully considered continued cooperation with the State as a means of avoiding any prosecution of her; or an immunity agreement with the State; or a plea bargain with the State; or in the event prosecution and trial were necessary, a strong defense of coercion by Williams; or, in the event of conviction, a strong plea for leniency based on minimum participation. Weston could not, and did not, adopt any of these options because each of them would have put his client Williams in jeopardy. "A conflict of interest is present whenever one defendant

stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing." *Foxworth v. Wainwright,* 516 F.2d 1072, 1076 (5th Cir.1975).

The interests of Williams, however, were completely different from those of Paula. Williams was over 21, male, had a criminal record which included guilty pleas in 1976 to two felonies (theft and arson), and was deeply implicated in the crimes, there being an eyewitness (other than Paula) who could (and did) identify Williams as one of those active in the area when the crimes were committed and where the bodies were found. The same witness could (and did) identify the automobile of Williams as one of those in the area of the crimes when they were committed. Williams was subject to the death penalty.

The interests of Williams were to prevent Paula from continuing to cooperate with the State, to influence her to recant her grand jury testimony against him, and to influence her to forego any defense of coercion by Williams.

The interests of Williams were successfully advanced by his family and his attorney. Soon after May 17 Paula and her family moved in with the family of Williams, and Weston, already in contact with Paula's family, undoubtedly began advising her. So it was that on June 19 at the preliminary hearing, Paula—although a witness for the State—appeared with Weston and changed entirely her grand jury testimony. She denied that she knew anything about the May 11 crimes.

As a result of her change at the preliminary hearing, Paula was then indicted, Weston appeared formally for her, and the trial followed with Weston representing Paula, as well as Williams and Rainge.

We believe that the actual conflict between Paula and Williams clearly appears on the face of the record.

■ The Appellate Court of Illinois, in affirming Paula's conviction, rejected any argument that there was a conflict of interest between Paula and Williams, primarily for the reason, mistaken we believe, that their defenses at trial did not conflict (408 N.E.2d at 1157) because both denied having had anything to do with the crimes. The test for conflict between defendants is not whether the defenses actually chosen by them are consistent but whether in *making the choice* of defenses the interests of the defendants were in conflict. As expressed in a discussion of this point by the Fifth Circuit: "[T]he conflict occurred not in presenting the defense chosen by appointed counsel, but in selecting defenses and strategies in the first place." *Foxworth v. Wainwright, supra,* at 1079.

The Appellate Court also felt that to find Weston disqualified, it had to be assumed that Paula's grand jury testimony was true and that Weston knew it. We believe this reasoning also was mistaken. Weston's disqualification did not depend on the truth of Paula's grand jury testimony but on whether Weston could make an *independent* conflict-free judgment on that and other points. As long as Weston represented Williams he was not conflict-free and could not make an independent judgment. This appears to have been recognized by the Supreme Court of Illinois in its unpublished opinion filed April 16, 1982, when, in dealing with Williams' argument based on the representation by Weston of him and Paula, the Court said:

"... had Gray been represented by other counsel she might well have defended on grounds of coercion and become a witness against Williams."

If, because he was represented by Archie Weston, "the interests of justice require that Dennis Williams be granted a new trial", as ruled by the Supreme Court of Illinois (444 N.E.2d at 443), and if Rainge has been granted a new trial, as ruled by the Appellate Court of Illinois (445 N.E.2d 535), we are satisfied that Paula Gray, represented to her prejudice by the same Weston, should also be given a new trial.

24.

The District Court did not reach the merits of the matter, ruling that Paula has not

exhausted available state remedies under post-conviction relief procedure. Ill.Rev. Stat. ch. 38, §§ 122–1 and following.

■ The District Court recognized that claims which were raised (as was the conflict of interest claim) on direct appeal will not be reviewed in post-conviction proceedings in Illinois unless they are based on matters outside the record.

The District Court recognized that the petition and supporting memorandum do not rely on matters outside the trial record. The memorandum for petitioner asserts that the conflicting interests of Paula and Williams were "plain upon the trial record".

Nevertheless, the District Court held that the petition raised unexhausted claims because (1) suggestions of improprieties "truly deserve a hearing"; (2) there should be a hearing in which counsel can defend himself against serious charges; and (3) the state courts should be given the first chance to conduct such a hearing.

We believe that under the circumstances here present—especially the grant of new trials by the Illinois Courts to Williams and Rainge *after* the decision of the District Court in the case at bar—these reasons are not sufficient to require Paula to attempt to secure post-conviction relief in the Illinois Courts. In making this determination, we have in mind the considerable lapse of time since the crimes were committed and since the date of the conviction. The interests of justice will be better served if the new trial can be conducted with reasonable promptness.

The order of the District Court is reversed and the cause remanded to that Court with directions to issue an order to respondent to release Paula Gray unless the State elects to retry her within such reasonable time as may be fixed by the District Court.

* The appellee herein never filed an appellate brief. The case has been submitted to the court for decision on the record and on appellant's brief. We conclude oral argument will not significantly aid the court in deciding the case. *See* Rule 34(a), Fed.R.App.P.; Circuit Rule 14(f).