**Lee O. GRIFFIN, Petitioner–Appellee,**

v.

**Richard D. McVICAR, Warden, Shawnee Correctional Center, Respondent–Appellant.**

No. 95–2330.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1996.

Decided May 21, 1996.

Arden J. Lang (argued), Charles M. Schiedel, Office of the State Appellate Defender, Springfield, IL, for Petitioner–Appellee.

Arleen C. Anderson (argued), Office of the Attorney General, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUDAHY and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

Respondent, Warden McVicar, appeals the grant of petitioner Lee Griffin's habeas corpus petition. The district court granted the writ of habeas corpus on grounds of ineffective assistance of counsel due to an actual conflict of interest inhering in the joint representation of Griffin and a co-defendant, Jimmy Lee Smith, by Marvin Goldenhersh in a 1981 murder trial. We affirm.

## I. Introduction

Lee Griffin and Jimmy Lee Smith were convicted in June 1981 of the shooting murder of Charles Sims, Christi Smith and Ronald Walker and of the serious wounding of Charles Kellick. The shootings occurred on February 5, 1981, in the apartment which Smith and Walker shared. Three men were identified by witnesses as having been involved in the shootings—Lee Griffin, Jimmy Lee Smith and Will Hudson, who apparently was never apprehended. Griffin was initially represented by attorney Ralph Derango. He told Derango that, though he had walked in during the shooting episode, he had not been involved in the shootings but was merely an innocent bystander who had, in fact, tried to stop the shooting. On this basis, Derango approached police officer L.C. Moore and attempted to negotiate a deal for Griffin in exchange for his testimony against Smith. Derango's overtures were apparently not well-received by the State and, perhaps for that reason, Griffin's family retained Marvin Goldenhersh in Derango's place approximately three weeks after Griffin's arrest. The state court opinions in this case indicate that Mr. Goldenhersh was already representing Jimmy Smith at that time.[1] *People v. Griffin*, 124 Ill.App.3d 169, 79 Ill.Dec. 509, 511,

---

1. Mr. Goldenhersh disputes this fact in his deposition, taken in connection with this habeas petition. There he claims that he undertook representation of Griffin prior to taking on the representation of Jimmy Smith. Since no one suggests that Mr. Goldenhersh *intentionally* gave preference to the representation of Smith over the representation of Griffin, the order in which he took on their cases is not of any material significance to the resolution of this appeal.

463 N.E.2d 1063, 1065 (5 Dist.1984); *People v. Griffin*, 109 Ill.2d 293, 93 Ill.Dec. 774, 777, 487 N.E.2d 599, 602 (1985).

Mr. Goldenhersh moved to sever the trials of the two defendants on grounds that Jimmy Smith's extensive criminal record might prejudice Griffin and that either defendant might have made admissions which could prove damaging to the other.[2] In arguing the motion Mr. Goldenhersh specifically cited examples of admissions made by Griffin. The motion to sever was denied.

The potential for conflict of interest in the joint representation of Griffin and Jimmy Smith was raised at least twice prior to trial, although not by Mr. Goldenhersh. When questioned by the judge prior to trial, Mr. Goldenhersh asserted that there was no conflict in his joint representation. Then, during the hearing of motions just prior to trial, the State, apparently concerned about the potential for reversal on appeal, raised the issue of potential conflicts:

> Mr. Hamilton [State's Attorney]: The second question which I think we should deal with is whether these defenses, these defendants' defenses will become, if they are not now, antagonistic to each other at some point in the trial. Now Mr. Goldenhersh has represented both of these defendants for some time. He has access to the Discovery provided by the State's Attorney's Office. He has talked with both of these defendants, and I don't think he should be permitted to just juggle strategic weapons, if [sic] I'm not trying to suggest that there is anything improper into his continued representation of both defendants, but if he now knows that such a conflict may develop, perhaps there is a question of whether he can continue to represent both the parties. . . .

Trial Tr. at 12.

Neither Mr. Goldenhersh nor the trial judge responded to this point and the case proceeded to trial without further inquiry into the matter.

## II. The Trial

### A. The Evidence

The eyewitness testimony, taken as a whole, established that three men, other than the victims, were in the apartment during the period in which the shootings occurred. Christi Smith was already in the apartment with one of these men when Sims and Kellick, who had come by to visit Christi and were outside the apartment, heard her crying. When she did not answer the door, they went in to investigate. Velma Robinson, who had come with Sims and Kellick, remained outside in Kellick's truck while they went in. Velma saw two more men get out of a red and white Cadillac and enter the apartment after Sims and Kellick had gone in.

When Sims and Kellick entered the apartment looking for her, Christi Smith was in the bathroom with one of the other three men. The two men whom Robinson had seen enter came up behind Sims and Kellick. At this point, Sims was shot by the man in the bathroom, according to Kellick. Kellick turned to run and he was shot twice—once in the back of the head and once in the face after he fell. At some point after the three men left, Kellick managed to crawl out of the apartment and hide in a basement or crawl space under the stairs.

Next, Robinson saw the same two men she had observed entering leave the apartment and drive away. A few minutes later Walker returned home and went into the building. Shortly after that, the two men in the Cadillac returned, got out of the car and went into the building as well. Robinson heard another shot, at which time she drove away in search of police. Though Walker was shot five times, he managed to make his way to a nearby convenience store where he spoke to several police officers. He died shortly

---

2. Mr. Goldenhersh recalls in his deposition that the primary grounds for the motion to sever was the potential prejudice to Griffin from Smith's criminal record and that "anything else that [he] threw into the motion would have been incidental." Resp. App. Exh. F at 32. This recollection is contradicted by the severance hearing transcript which shows that the possibility of damaging admissions was a substantial basis for the motion. Pet. App. Exh. E. Indeed, the discussion during that hearing focused almost entirely on potential prejudice due to damaging admissions.

thereafter, having been taken by ambulance to a hospital.

The key issues at trial were the identification of the three men and of the role each had played. Smith was identified as a shooter by the testimony of Kellick and of three witnesses who testified as to the dying declarations of Walker. Kellick testified that Jimmy Smith shot him in the face and kicked him after he was felled by a shot from behind as he tried to run away. Three witnesses testified to having heard Walker's dying declarations in the convenience store. Police officer Settles, state trooper Rice and store manager David Winchester each testified that he heard Walker say that Jimmy Smith shot his girlfriend (Christi Smith).

While this testimony consistently implicated Smith, there were significant contradictions in the testimony implicating Griffin in the shootings. Kellick testified that Griffin was the first man in the apartment and was in the bathroom with Christi Smith when Kellick arrived. Thus, Kellick testified, it was Griffin who shot Sims. Kellick did not identify Griffin immediately, however. He was hospitalized after the shootings due to his serious injuries. A police officer testified that at the hospital in the hours just after the shootings Kellick told him that he didn't know who had done the shooting. Tr. at 337. Kellick testified that he did not remember talking to police during the first few days after the incident. Kellick later identified Griffin from a videotaped lineup several days after the shooting. He testified that he recognized Griffin from having seen him on two prior occasions.

Robinson, in direct contradiction of Kellick's testimony, identified Griffin as one of the two men who emerged from the red and white Cadillac (later shown to be Griffin's) and entered the apartment *after* Sims and Kellick.

Police officer Settles testified that Walker said that "Lee" shot him. State trooper Darrell Rice, however, testified that Walker said that *Lee's friend* shot him. Winchester had not heard Walker say who had shot him.

In sum, while Kellick's unrefuted testimony identified Jimmy Smith as his assailant and all three witnesses to Walker's dying declaration reported his identifying Jimmy Smith as Christi Smith's assailant, only two witnesses, Kellick and Settles, gave testimony suggesting that Griffin had shot anyone. The testimony of each of these latter two witnesses was directly contradicted by other testimony. Thus, the identification evidence against Jimmy Smith was much stronger than the evidence against Griffin.

### B. The Theory of Defense

At trial, Griffin and Smith were both represented by Mr. Goldenhersh. The two defendants presented a joint alibi defense, consisting of Griffin's testimony that he and Smith had been at a local tavern playing cards at the time of the murders. The alibi was supported to some extent by the testimony of a witness, Priscilla Smith,[3] that she had loaned Griffin five dollars and danced with him at the tavern. Priscilla Smith placed the defendants at the tavern between 4:30 and 5:00 p.m. and again at sometime after 6 p.m. and said that she did not see them there after about 6:30 p.m. The shootings apparently took place sometime between 5 p.m. and 6:30 p.m., when Walker showed up at the convenience store.

The alibi story was presented through Griffin's and Priscilla Smith's testimony. However, Mr. Goldenhersh's major trial strategy was apparently to discredit the eyewitness identifications of Griffin and Jimmy Smith. Indeed, Mr. Goldenhersh did not even mention the alibi in either his opening or closing argument. Mr. Goldenhersh's efforts to discredit the eyewitness testimony were organized around a theory that the shootings were linked to the drug-related killing of Griffin's brother, which had occurred just a few weeks earlier.[4] In his

---

3. As far as we can ascertain from the record, Jimmy Smith, Christi Smith, Priscilla Smith and another witness, Betty Smith, are not related to one another.

4. Any connection between Griffin's brother and Sims was evidenced only by Moore's hearsay grand jury testimony that he had received an anonymous phone call connecting the two. The story was presented to the grand jury to suggest

opening statement, for example, Mr. Goldenhersh said that the evidence would show that Sims and Kellick "after killing the brother of Griffin, ... then have set up and plotted, plainly set up and plotted to make his brother, Lee Griffin, and Jimmy Smith the scapegoats of this dope-related killing." Tr. at 159. To this end, Mr. Goldenhersh repeatedly tried to elicit detailed testimony about the drug involvement of the victims and to connect them to Griffin's dead brother. The State resisted these attempts, stating in a portion of the proceedings held away from the presence of the jury that "[a]t best, all that Mr. Goldenhersh's offer of proof does is provide speculation as to motive, and provide a motive for particularly defendant Griffin to have committed the offenses named in the indictment." Tr. at 454. The trial court sustained the State's objections to questioning along these lines, finding such questions irrelevant to the identification issues at hand. Mr. Goldenhersh, however, continued to pursue the scapegoat theory in his closing arguments, pointing out the time which passed after the shootings before either Kellick or Robinson identified the defendants and arguing that Kellick and Robinson were participating in a "cover-up." Mr. Goldenhersh discussed at length the fact that Sims had one thousand dollars with him when he went to Christi Smith's house and insinuated that the police investigation was not thorough and that "there couldn't be all this dope and one thing and another without some police involvement." Tr. at 499.

## III. History of the Ineffective Assistance Claim

### A. State Court History

Griffin has pursued the ineffective assistance claim which is the subject of this appeal through numerous state court proceedings. Griffin first presented the claim in his direct appeal of his conviction. In that appeal, Griffin relied on Mr. Goldenhersh's failure to present a non-participating bystander defense as grounds for the ineffective assis-

tance claim. Griffin Direct App. Br. He noted that Mr. Goldenhersh was aware that Griffin had made statements to the police indicating that he had been present at the scene and knew who had done the shooting, but that Mr. Goldenhersh, in spite of this, still did not pursue an innocent bystander defense.

In addition, Griffin argued that the joint representation left Mr. Goldenhersh completely unable, without compromising his representation of Smith, to impress upon the jury that the eyewitness testimony was much less conclusive with respect to Griffin than it was with respect to Smith. Instead, Mr. Goldenhersh was forced to attempt to discredit completely the testimony of these witnesses, including testimony, such as that of Trooper Rice. Rice reported Walker as saying that it was "Lee's friend" who shot him. Of the same ilk was the testimony of Robinson that Griffin was not in the apartment when Kellick and Sims entered. This evidence would have tended to exonerate Griffin at Smith's expense.

Griffin pointed out on direct appeal that Mr. Goldenhersh not only failed to pursue lines of inquiry which would have aided him at Smith's expense, but actively pursued a defense strategy which was highly prejudicial to Griffin alone. By presenting the scapegoat theory, Griffin argued, Mr. Goldenhersh "succeed[ed]" in [his] opening statement in giving the jury a motive for Griffin to kill the victims that the State would not have been able to elicit ... [and in] taking a defendant with no record and involving him by implication in dope traffic and a 'dope-involved killing'." Griffin Direct Appeal Br. at 13.

Finally, Griffin pointed out various other shortcomings in Mr. Goldenhersh's representation, such as his attack on the morals of the victims on grounds of "drugs and inter-racial sex"; his suggestion that Kellick was involved in a cover-up when after being shot in the head he took three days to identify the perpetrators; Mr. Goldenhersh's complete

---

that Sims was at least indirectly responsible for the death of Griffin's brother, thereby providing a motive for Griffin to shoot Sims. he prosecution apparently abandoned this theory and the speculation about a connection between the kill-

ings came in at trial only through Mr. Goldenhersh's opening, Tr. at 158–59, and closing, Tr. at 498, arguments and his attempts to question Officer Moore about a possible connection. Tr. at 348–49.

failure to present any evidence in support of his scapegoat theory; and his failure to object to various bits of damaging argument such as the State's Attorney's assertion that Walker identified Lee Griffin as his killer.

The Illinois Appellate Court, on May 14, 1984, ruled that the proposed alternative bystander defense was "too speculative to constitute the actual conflict required ..." for ineffective assistance. The court noted that there was "nothing in the record to indicate that defendant Griffin presented his attorney with any facts other than those supportive of the alibi defense." Finally, the court stated that "[t]he failure of counsel to adopt a defense inconsistent with his client's testimony cannot reasonably be characterized as incompetent." *Griffin*, 79 Ill.Dec. at 508, 463 N.E.2d at 1062.

While waiting for his appeal to be resolved, Griffin filed a state post-conviction petition. That petition was heard on October 12, 1982. In the hearing on that petition, Griffin testified that he had told both Derango and Mr. Goldenhersh that he had been present at the time of the attacks but that he had not shot anyone nor condoned the shooting. He stated that Mr. Goldenhersh had told him that if he said he was present he would be found guilty on an accountability theory. Griffin testified that he had lied at his trial when he stated that he and Smith were playing cards at the tavern while the shootings took place. He explained that he had lied because he believed that if he put himself at the scene of the crime he would be held accountable. Griffin also testified that Mr. Goldenhersh never talked to him about having his case tried separately from Smith's and that he and Smith and Mr. Goldenhersh had agreed that, because of Smith's prior record, Griffin would have to be the one to take the stand and testify to the alibi.

In the post-conviction proceeding, Griffin's attorney argued that the joint representation presented a conflict, for some of the same reasons argued on direct appeal, and that it constituted ineffective assistance of counsel. The trial judge denied the post-conviction petition, saying:

> The Court is very familiar with the case, and of course what the defendant is asking

me to do is disregard his prior perjured testimony and to say now that he has seen the light, and he's in to tell the truth. I don't know whether he's telling the truth or not. I don't know whether he told his attorney Mr. Goldenhersh that or not. He was afforded a defense according to the defendant's own testimony on the stand under oath. There was no conflict in the defense between the defendant and his co-defendant. Motion will be denied.

Resp. App. Exh. C at 21–22.

Griffin's appeal of the denial of his post-conviction petition was decided by the Illinois Appellate Court on the same day as was his direct appeal. That court reversed the trial court and granted Griffin's post-conviction petition on grounds of ineffective assistance of counsel. *People v. Griffin*, 124 Ill.App.3d 169, 79 Ill.Dec. 509, 463 N.E.2d 1063 (5 Dist. 1984). The court relied on the principle that "in some instances, however, the choice of treating co-defendants differently is more than a mere possibility; it is forced on counsel by the difference in evidence offered against co-defendants." *Id.* 79 Ill.Dec. at 517, 463 N.E.2d at 1071. The court pointed out that:

> In order to take full advantage of the inconsistencies in the identification of Griffin, Goldenhersh would have had to distinguish between the uncontradicted assertions that Smith killed the girl and shot Kellick and the uncertainties about the identity of the man in the bathroom who shot Sims and the man or men who shot Walker. As it was, he only pointed to the inconsistencies and ambiguities as matters going to the credibility of the State's witnesses. Counsel could not give Griffin the best possible defense under the circumstances because to do so would have been disloyal to Smith, his original client. Because of this conflict of loyalties, he remained silent when independent counsel would have spoken out on Griffin's behalf.

*Id.* at 518, 463 N.E.2d at 1072. For these reasons the Appellate Court granted Griffin's petition.

On the State's appeal to the Illinois Supreme Court, however, the decision of the

Appellate Court was reversed. *People v. Griffin*, 109 Ill.2d 293, 93 Ill.Dec. 774, 487 N.E.2d 599 (1985). The Illinois Supreme Court emphasized that the Appellate Court was not in a position to judge the credibility of Griffin's testimony regarding what he had told Mr. Goldenhersh about whether he was present at the scene of the shooting. The Illinois Supreme Court also was unconvinced that Mr. Goldenhersh's failure to closely explore the discrepancies in the identification testimony of the various state witnesses was ineffective assistance. The Court said that "[b]ased on these discrepancies, trial counsel did attack the credibility of the witnesses. His attack, however, was probably somewhat deflected by the fact that the defendant was testifying to the joint alibi that he and Smith were at the tavern.... It would seem incongruous to permit a defendant to perjure himself and then benefit from that perjury by successfully contending that his attorney, because of the perjury, did not most effectively explore grounds for his advantage." *Id.* 93 Ill.Dec. at 779, 487 N.E.2d at 604.

## B. Federal Habeas Corpus Proceedings

Griffin's federal petition for writ of habeas corpus continued to argue that he received ineffective assistance of counsel from Mr. Goldenhersh due to the joint representation. Mr. Goldenhersh was deposed in connection with the habeas corpus proceedings. The magistrate judge found that "[i]n his deposition, Marvin Goldenhersh stated that only facts relating to the alibi defense were given to him while preparing for trial." He also found that "Mr. Goldenhersh further stated that he never discussed the theory of accountability with the petitioner and did not tell him that he would be found guilty if he admitted being at the scene." On this basis, the district court denied the habeas corpus petition. Resp. App. Exh. A at 11.

On appeal, however, this court noted apparent inconsistencies between the district court's factual findings and the record. In particular, we pointed out that Mr. Goldenhersh testified in his deposition that he did discuss accountability with Griffin and that he stated that "there was the possibility that [Griffin] could be found guilty on the basis of

accountability." *Griffin v. Camp*, 40 F.3d 170, 174 (7th Cir.1994). We also noted that "[a]lthough Goldenhersh unequivocally stated that Griffin only gave him one version of the events—the version supporting the alibi defense—Goldenhersh's other statements indicate that he had access to a significant amount of evidence which pointed to another potential defense." *Id.*

Finally, we pointed out that the district court neglected to explain "how the law, when applied to these facts, led to the conclusion that Griffin had effective assistance of counsel." *Id.* We thus remanded the case to the district court for clarification.

On remand, the district court reviewed the record and found that an actual conflict of interest existed. The district court relied on two grounds for this conclusion. First, the court acknowledged that Mr. Goldenhersh testified in his deposition that Griffin never told him facts which were at odds with the alibi defense. However, the court noted that the record shows that Mr. Goldenhersh was aware before trial of facts suggesting the availability of a viable innocent bystander defense. The district court also stated that "only Jimmy Smith would have benefited from an alibi defense," noting that "Jimmy Smith, as a convicted felon was unable to testify" so that "[i]n a joint trial, only [Griffin] was able to take the stand in their behalf." Finally, the court pointed out that the alibi defense provided the only way in which Mr. Goldenhersh could have represented both clients. Dist.Ct. Order at 12–14.

Based on these considerations, the district court found that a conflict of interest existed between Griffin and Smith such that joint representation of the two was precluded. The court also recognized that the record clearly showed that Griffin had never waived any conflict of interest between Smith and him with respect to their respective defenses. The district court thus granted Griffin's petition for a writ of habeas corpus.

## IV. Analysis

In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court set out the standard for a finding of ineffective assistance of counsel

based on multiple representation. There, the Court held that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 100 S.Ct. at 1718. A mere possibility of a conflict is not sufficient to violate the Sixth Amendment. However, once a defendant has shown that an actual conflict exists, no showing of prejudice is required. *Id.* at 348–50, 100 S.Ct. at 1718–19. In general, trial courts are not required to inquire into the possibility of a conflict and "may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Id.* at 347, 100 S.Ct. at 1717.[5]

 The determination whether a particular case presents an actual, as opposed to a potential, conflict of interest is not always straightforward. The mere presentation of a "common defense" does not conclusively demonstrate that any conflict of interest was merely potential. "A conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing." *United States ex rel. Gray v. Director, Dept. of Corrections,* 721 F.2d 586, 596–97 (7th Cir.1983), quoting *Foxworth v. Wainwright,* 516 F.2d 1072, 1076 (5th Cir.1975). Conversely, the mere fact that co-defendants abandon a pre-trial stance in which they accuse each other of a crime in favor of a common defense does not lead ineluctably to the conclusion that their attorney faced an actual conflict of interest. *United States v. Cirrincione,* 780 F.2d 620, 629–31 (7th Cir. 1985). When a defendant makes a purely

tactical decision to abandon a defense which is adverse to that of a co-defendant, he or she cannot then claim to have been a victim of ineffective assistance of counsel. *United States ex rel. Cole v. Lane,* 752 F.2d 1210, 1220 (7th Cir.1985).

 Thus, in circumstances such as the present case, where a defendant has pursued a common defense rather than an alternative defense adverse to the interests of a codefendant, a showing of ineffective assistance of counsel requires that the complaining defendant show "specific instances where [his] attorney could have, and would have, done something different if that attorney had represented only one defendant." *Cirrincione,* 780 F.2d at 630–31. However, these specific instances need not be taken solely from the conduct of the trial. Instances in which choices of strategy would have been made differently had there been separate representation may also demonstrate ineffective assistance of counsel. "The test for conflict between defendants is not whether the defenses actually chosen by them are consistent but whether in making the choice of defenses the interests of the defendants were in conflict." *Gray,* 721 F.2d at 597.

 Applying these standards to the present case, we find that the district court was correct in ruling that an actual conflict of interest existed in the joint representation of Griffin and Smith.

Mr. Goldenhersh was possessed of information which would have suggested to an unconflicted counsel the availability of a defense focused on discrediting the identification of Griffin and shifting the blame onto Jimmy Smith. Whether or not Mr. Goldenhersh was actually told by Griffin that he had been present at the scene of the shooting,[6]

---

5. It is worth pointing out, however, that if the trial court "knows or reasonably should know that a particular conflict exists" the court is required to initiate an inquiry. *Cuyler v. Sullivan,* 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980). The Federal Rules of Criminal Procedure, in fact, require that whenever there is joint representation "the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation."

Fed.R.Crim.P., Rule 44(c). In the current case the prosecution brought the potential for conflict of interest to the attention of the trial court. There is perhaps a question whether at that point the trial court was obligated to inquire further into the matter. Since the Petitioner does not raise this question, however, we pursue it no further.

6. The district court did not make a specific determination whether Mr. Goldenhersh was informed by Griffin that he had been at the scene

Mr. Goldenhersh did know that Griffin had stated earlier to Derango and to Officer Moore that he had been there and could identify Smith as a shooter. Mr. Goldenhersh had also received discovery from the prosecution which included police reports indicating that Kellick had identified Griffin as the man who shot Sims and reports describing the conflicting versions of Walker's dying declaration. Prior to trial, Mr. Goldenhersh received a memorandum from the prosecution purporting to describe the revised testimony which Robinson intended to give. Trial Tr. at 107. In her testimony, Robinson identified Griffin as one of the two men who arrived at the scene in the Cadillac. Trial Tr. at 226. Given all of this available information, we cannot accept the conclusion that Mr. Goldenhersh was unaware of the difficulties with the alibi defense and the possibility of an innocent bystander defense.

The question, then, is what Mr. Goldenhersh was obligated to do with this information in order to provide effective assistance of counsel. Of course, the mere fact that a defendant chooses one of two available defenses cannot establish ineffective assistance of counsel, even if the defendant makes a bad choice. However, counsel may be ineffective if the joint representation precludes an obvious and viable alternative defense when the common defense is so completely untenable. Failure to consider the possible defenses with a mind to the best interests of a client is particularly likely when the alternative to a

common defense is helpful to one client but is highly detrimental to the other (as was the case here).

Here, in spite of all the information suggesting the likely untruth of Griffin's alibi and the near certainty that it would not be believed by a jury, there is no suggestion in the record that Mr. Goldenhersh pressed Griffin as to the validity of the alibi, discussed with him the possibility of a bystander defense or pointed out the comparative weakness of the State's case against him as opposed to the case against Smith. Even if Griffin did represent that the alibi story was true, an effective attorney would have discussed with Griffin the disadvantages of linking his fortunes to those of Smith, given the strength of the eyewitness identifications of Smith and Smith's extensive criminal history.[7] An attorney free to consider Griffin's singular interests would, particularly in light of Griffin's waffling on his story, have pointed out the possibility of resting a defense on the weakness and contradictions in the testimony implicating him in the shootings. This approach would have compared favorably with bringing in an alibi which left Griffin with the task of refuting the evidence against Smith as well.

This case is thus distinguishable from *Cirrincione* and *Cole*. In *Cirrincione*, the defendant claimed that he refrained from testifying at his joint trial with his father because he feared that his testimony would hurt his

---

of the crime. Such a determination is not necessary to our resolution of this case, for we assume for purposes of this discussion that, contrary to Griffin's testimony, Mr. Goldenhersh was not told by Griffin that he had been present at the time of the shootings. We note, however, that Mr. Goldenhersh's deposition testimony as to what Griffin told him in this regard is not entirely consistent. While Mr. Goldenhersh insists that Griffin never presented him with facts which conflicted with the alibi story, he also stated at one point that "my recollection of what Griffin told me about the occurrence was that he and Smith were there, but by the time they got there, that the shootings had already occurred." Resp. App. Exh. F at 15. Later in the deposition, Mr. Goldenhersh backed away from this statement, saying that he was not sure where he had gotten the idea that Smith and Griffin had been present at the scene of the shootings. Similarly, Mr. Goldenhersh, at one point, stated that his discussion of accountability with Griffin was prompted

by Griffin's questions concerning the effect of the statements he had made to Derango. *Id.* at 21–22. When pressed, however, Mr. Goldenhersh couldn't say for sure "whether [Griffin] talked in terms of this is what he told Derango or whether he talked in terms if this were his testimony." *Id.*

In general, and understandably after a ten year lapse of time, Mr. Goldenhersh's deposition testimony indicated considerable confusion in his recollection of events. For example, he stated that the motion to sever was primarily based on concerns with Jimmy Smith's criminal record. In fact, the record of the severance hearing clearly indicates that Mr. Goldenhersh was at least equally concerned with the potential effects of Griffin's damaging admissions on Smith's case.

7. We note in this regard that the fact that a client tells an attorney he has an alibi does *not* require the attorney to present the alibi defense.

father. The court, however, found that it was "not clear how [his] testimony ... could have hurt [his father]" and that it was "highly unlikely that Tom refused to take the stand" to protect his father. Similarly, the court found little merit in the defendant's contention that he was damaged by his inability to cross-examine his father when there was "nothing in the record inculpatory of [the defendant] that was not already corroborated by other witnesses' testimony." *Cirrincione*, 780 F.2d at 631.

In *Cole*, the defendants never moved to sever the trial despite statements that each had given to police admitting that both were present at the scene of an armed robbery but accusing the other of having taken the money and carried the gun. At trial the defendants abandoned their mutual accusations and presented a common defense in which they attacked the credibility of prosecution witnesses and explained why they were in the area where the armed robbery occurred. *Cole*, 752 F.2d at 1220. The facts of *Cole* do not suggest that the decision to pursue a joint defense redounded to the detriment of one co-defendant and to the advantage of the other. The two co-defendants were in apparently equivalent positions and seemingly made a joint decision to give up accusing each other and gain the advantages of a consistent defense. There is thus nothing about *Cole* which suggests that separate counsel would have done anything differently.[8]

The current case, however, is not one, like *Cirrincione*, in which co-defendants gambled on a common defense which was as likely to prove advantageous to one as to the other. Nor is it a case, like *Cole*, in which the

avenues of inquiry closed off by the joint representation were of little consequence. In contrast to these cases, the record here suggests that both before and during the trial, Mr. Goldenhersh's choices were unacceptably constrained by the joint representation of Griffin and Smith and that these constraints worked to the unilateral disadvantage of Griffin.

The decision to present the alibi defense was, as the district court noted, clearly favorable for Smith's defense but likely detrimental for Griffin's. Without Griffin's alibi testimony, Smith did not have a leg to stand on in presenting a defense. He was unequivocally identified as having shot two of the victims and he had an extensive criminal record which effectively precluded him from testifying. Griffin, on the other hand, had the option of pursuing a defense based on the inconsistencies in the testimony identifying him as a shooter.[9] These inconsistencies included: (i) the conflict between Kellick's testimony that Griffin was already in the apartment when he and Sims arrived and Robinson's testimony that Griffin was one of the two men who followed Kellick and Sims in; (ii) the conflict between Officer Settles' report that Walker's dying declaration was that "Lee" shot him and Trooper Rice's account that Walker said that "Lee's friend" shot him; and (iii) the implied conflict between Kellick's identification of Griffin as the one man already in the apartment and Walker's statement, attested to by all three witnesses, that Jimmy Smith killed his girlfriend, Christi Smith. (This last statement presents an implied conflict because Walker also said that Christi Smith was dead when he arrived at the apartment. Thus Walker's

8. *Cole* contains a statement that "in all of the cases where we have found an actual conflict of interest between codefendants who were jointly represented by the same defense counsel, the defendants did not abandon their defenses." *Cole*, 752 F.2d at 1220. This statement is incorrect, ignoring as it does the finding of actual conflict of interest in *Gray*, in which the defendant abandoned an adversarial defense in favor of a common defense with a co-defendant whom her attorney jointly represented. *Gray*, 721 F.2d at 597. In any event, the statement in *Cole* was merely one of statistics and not one of principle.

9. The dissent contends that by emphasizing the strength of the case against Smith we "fail[ ] to

concretely evaluate the relative strengths of the two potential defenses that were available to Griffin." Dissent at 892. There are two reasons for focusing on the strength of the case against Smith. First, as the dissent acknowledges, the presentation of the joint alibi defense inextricably bound Griffin's defense to that of Smith's. Griffin's alibi defense could be no stronger than Smith's. Second, the power of the case against Smith meant that the joint alibi was essentially the only defense available to Smith. This circumstance deepened the conflict inherent in the joint representation.

identification of Jimmy Smith as her killer was likely based on Jimmy's having been present when Walker arrived. Robinson, however, testified that Griffin and another man had left the apartment by the time Walker arrived and that they went back in only *after* Walker.)

In the face of the uncontradicted evidence placing Smith at the scene during the shootings, Griffin's testifying to an alibi which involved Smith could do nothing but damage his own case. While a defense based on simply raising doubts about the credibility of the testimony implicating Griffin in the shootings might well have been unsuccessful, the joint alibi defense was nearly as weak as no defense at all.[10] There was only the slimmest chance, if any, that a jury would believe the alibi in the face of the consistent eyewitness testimony placing Griffin and Smith at the scene of the murders. On the other hand, an attorney representing only Griffin could have impeached the identifications of Griffin as a shooter by exploiting obvious inconsistencies in testimony. The joint representation prevented Mr. Goldenhersh from exploiting the disparity in strength of the respective prosecution cases against Griffin and Smith.

It is true that the innocent bystander defense was not promising. It is often the unenviable job of defense counsel to choose among unpromising defenses. However, when an actual conflict of interest due to joint representation constrains an attorney to choose the hopeless in favor of the unpromising, the defendant has received ineffective assistance of counsel.

The disadvantage to Griffin which the joint alibi defense unavoidably imposed was exacerbated by Mr. Goldenhersh's conduct of the trial. The extent to which the scapegoat argument relating to Griffin's brother's killing could have been helpful even to Smith is highly questionable. In any event, it is most unlikely that any attorney representing only Griffin would have pursued such an unpromising tack. An unconflicted attorney would not have had to resort to the suggestion that the victims implicated Griffin in order to frame him because they were responsible for his brother's death a few weeks earlier. Such a flimsy theory may have been the only thing available to Smith given the consistent testimony identifying him as a shooter, but no effective attorney representing Griffin alone would have resorted to it.

Finally, Mr. Goldenhersh was apparently so confused by his joint representation of the two defendants that he argued in closing that Walker, in his dying declaration, "told them ... that Lee Griffin shot my girl friend." Trial Tr. at 488. In fact, the three witnesses to Walker's dying declaration unanimously reported that Walker said that it was *Smith* who shot his girlfriend, even though they differed as to what Walker said about his own attacker. Mr. Goldenhersh's statement was not a mere slip of the tongue. Mr. Goldenhersh argued that Walker's identification was unreliable by suggesting that he could not have known who shot his girlfriend since she was already dead when he arrived. In pursuing this effort, Mr. Goldenhersh suggested that "it could be argued that because Lee Griffin allegedly then shot him, that he jumped to the conclusion that he also shot his girl friend." *Id.* Thus, Mr. Goldenhersh not only told the jury incorrectly that Griffin was accused of shooting Christi Smith. But he also accepted as a premise for his argument that Walker had said that Griffin had shot him. In fact, of course, the witnesses to the declaration disagreed as to whether Walker implicated Griffin or "Lee's friend." Such a prejudicial confusion of the evidence would not have occurred if Griffin had had his own representation.

In conclusion, the record in this case undoubtedly provides "specific instances where [Griffin's attorney] could have, and would have, done something different if that attorney had represented only one defendant." *Cirrincione,* 780 F.2d at 630–31. The record therefore supports the district court's conclusion that an actual conflict of interest infect-

---

**10.** The dissent agrees "that the evidence at trial did not conclusively demonstrate that Griffin was a shooter." What the dissent neglects to note is that the evidence at trial *did* conclusively demon- strate, to all intents and purposes, that Griffin and Smith were at the scene at the time of the shootings.

ed the joint representation of Griffin and Jimmy Smith. Lastly, the district court found, and we agree, that the record discloses no waiver of this conflict on Griffin's part. In fact, Mr. Goldenhersh never discussed the potential for conflict of interest with Griffin. Such an unwaived actual conflict of interest is a violation of the Sixth Amendment and requires the granting of Griffin's Petition for Writ of Habeas Corpus.

Therefore, we affirm the judgment of the district court. The writ shall issue, thereby releasing Griffin from custody, unless the State of Illinois elects to retry him within one hundred twenty (120) days from the issuance of this Court's final mandate.

AFFIRMED.

FLAUM, Circuit Judge, dissenting.

The Supreme Court has held that in order to establish ineffective assistance of counsel based on multiple representation, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). It is not enough for the defendant to prove the existence of a possible or potential conflict of interest. *Id.* This court has held that where a defendant pursues a common defense rather than one adverse to his codefendant, the defendant, to establish more than merely a potential conflict, "must show specific instances where [his] attorney could have, and *would have*, done something different if that attorney had represented only [the] defendant." *United States v. Cirrincione*, 780 F.2d 620, 630–31 (7th Cir.1985) (emphasis added). The majority applies these standards and decides that attorney Marvin Goldenhersh's representation of Lee Griffin violated the Sixth Amendment. I conclude, however, that Griffin has failed to demonstrate anything more than a possible conflict and therefore respectfully dissent from the majority's decision.

The relevant issue in this case boils down to whether an attorney representing Griffin alone would have presented the innocent bystander defense instead of the alibi defense at trial. Much of the majority's analysis, however, focuses not on the choice of defenses but rather on the pre-trial discussions that Goldenhersh had with Griffin regarding his defense. Relying completely on the absence of evidence in the record, the majority concludes that no consideration or discussion of possible defenses occurred. Yet it is the defendant's burden to prove that his attorney had an actual conflict of interest in advising him. *See, e.g., Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718; *Cirrincione*, 780 F.2d at 630–31 n. 4. Accordingly, "[t]he mere possibility of divided loyalties is insufficient to sustain the defendant's burden." *Id.* The district court did not find that Goldenhersh failed to examine with Griffin the weaknesses of the alibi defense and the possibility of presenting an innocent bystander defense. The record on this point is indeed inconclusive.[1] I fear the majority treads on dangerous ground by inferring the absence of specific discussions from an indeterminate record developed over ten years after the fact.

The record does make clear that Griffin told his previous attorney, Ralph Derango, that he was an innocent bystander, that Derango attempted to negotiate a agreement with the police where Griffin would testify against co-defendant Jimmy Smith, and that the police weren't buying Griffin's story. Confronted with this situation, Griffin's family decided to retain Goldenhersh and discharge Derango. And, although the exact nature of the conversations that took place between Griffin and Goldenhersh regarding Griffin's defense is unclear, we do know that, at trial, Goldenhersh presented the alibi defense, and Griffin testified under oath that he and Smith were at a tavern playing cards when the murders occurred. Thus, the facts of this case are analogous to those in *United*

---

1. As the majority points out, Goldenhersh's memory was less than clear regarding the extent to which Goldenhersh discussed the innocent bystander defense with Griffin. Yet Griffin's petition for habeas relief alleged that Goldenhersh erroneously advised him that the innocent by-

stander defense would fail, not that Goldenhersh neglected to discuss the defense with him. Moreover, the record is silent as to whether Goldenhersh explored with Griffin the dangers of linking his defense to Jimmy Smith's.

*States ex rel. Cole v. Lane,* 752 F.2d 1210 (7th Cir.1985), where the habeas petitioner abandoned a defense of accusing his co-defendant and testified under oath that neither he nor his co-defendant was involved in the crime. In *Cole,* we stated:

> [W]hen Cole was presented with an opportunity to accuse Cade of committing the armed robbery, Cole denied under oath telling the arresting officers that Cade had committed the crime. It is logical to assume from the record in this case, rather than demonstrating an actual conflict of interest, that in all probability the defendants agreed prior to trial upon a trial strategy of neither defendant testifying against the other. Because there is no evidence in the record that Cole ever pursued the defense of accusing Cade of committing the armed robbery and, to the contrary, disclaimed the defense under oath, we hold that Cole abandoned the defense of accusing Cade. Decisions to pursue or abandon defenses are tactical choices of trial strategy.... Since the decision to abandon the defense of accusing Cade was an obvious strategical and tactical decision, it may not be reviewed by this court on appeal.

752 F.2d at 1220. Where a defendant testifies under oath to the truth of a particular defense, we therefore presume that the defendant made a tactical decision to present the defense consistent with his testimony. Such a tactical decision cannot provide the foundation for a claim of actual conflict of interest. *Id.* Of course, the defendant can overcome this presumption of trial strategy by showing that an unconflicted counsel would have pursued a different course of action. *See, e.g., Cirrincione,* 780 F.2d at 631.

The evidence against Griffin left Goldenhersh with two options: he could have presented the alibi defense or the innocent bystander defense. The majority attempts to distinguish *Cole* by concluding that an unconflicted counsel representing Griffin would have presented a defense based on inconsistencies in the testimony identifying him as a shooter. Yet the majority fails to concretely evaluate the relative strengths of the two potential defenses that were available to Griffin. Only by comparing the strengths and weaknesses of the two defenses can we decide whether an unconflicted counsel would have presented the innocent bystander defense rather than the alibi defense.[2] Certainly, the evidence supporting the alibi defense was weak at best. The alibi was only partially corroborated by Priscilla Smith, and extensive evidence placed both Griffin and Jimmy Smith at the scene of the crime. Furthermore, the defense had the disadvantage of connecting Griffin's story to that of Jimmy Smith, who was consistently identified by witnesses as a shooter. This is not to say that the alibi defense lacked any advantages. We have noted that "[j]oint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack." *Cole,* 752 F.2d at 1220 (quoting *Holloway v. Arkansas,* 435 U.S. 475, 482–83, 98 S.Ct. 1173, 1177–78, 55 L.Ed.2d 426 (1978)). Although it may have been unlikely that Jimmy Smith would have testified against Griffin if they had been afforded separate trials, by presenting the alibi defense Goldenhersh eliminated this possibility entirely.

The majority posits that Griffin could have pursued a defense based on the inconsistencies identifying him as a shooter. I agree with the majority's assessment that the evidence at trial did not conclusively demonstrate that Griffin was a shooter. Yet the prosecution's case against Griffin was broader, implicating him as at least an accomplice to the murders. Both Robinson and Kellick clearly placed Griffin at the scene of the crime in a group of three men who committed the murders. To respond to this evidence, Goldenhersh could have presented the innocent bystander defense—Griffin could have taken the stand and testified that, al-

---

2. Much of the majority's opinion focuses on the relative strength of the cases against Griffin and Jimmy Smith. The fact that the case against Jimmy Smith was stronger than that against Griffin is relevant to evaluating the risks of linking Griffin's defense to that of Smith. It does not, however, directly determine the ultimate issue of whether an unconflicted counsel would have presented the innocent bystander defense.

though he was at the scene of the crime, he had nothing to do with the murders. Accomplice liability in Illinois is broad, however, and this defense would not have provided much hope for Griffin. Under Illinois law, a person is legally accountable for the conduct of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5–2. Although a person's mere presence at the scene of a crime is insufficient to impose criminal liability, active participation in a crime is not necessary for liability to be based on a theory of accountability. *People v. Davis*, 254 Ill.App.3d 651, 193 Ill.Dec. 636, 651, 626 N.E.2d 1187, 1202 (1993). The Illinois Supreme Court has stated:

> If the proof shows that a person was present at the commission of the crime without disapproving or opposing it, it is competent for the trier of fact to consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the crime. Stated differently, circumstances may show there is a common design to do an unlawful act to which all assent, and whatever is done in furtherance of the design is the act of all, making each person guilty of the crime.

*People v. Morgan*, 67 Ill.2d 1, 7 Ill.Dec. 69, 73, 364 N.E.2d 56, 60 (1977) (quoting *People v. Washington*, 26 Ill.2d 207, 186 N.E.2d 259, 261 (1962)). Other factors that Illinois courts have used to determine whether a defendant can be liable on an accountability theory include his association with the co-defendants (e.g., common arrival at the scene), flight from the scene, continued association with the perpetrators after the criminal act, and failure to report the incident. *See Morgan*, 7 Ill.Dec. at 73, 364 N.E.2d at 60; *Davis*, 193

Ill.Dec. at 651, 626 N.E.2d at 1202; *People v. Jones*, 12 Ill.App.3d 643, 299 N.E.2d 77 (1973) (holding defendant accountable for murder committed by co-defendant based on evidence that they arrived at scene together and fled together after murder).

In light of the law of accountability and the evidence against Griffin, the innocent bystander defense was far from promising. Robinson testified that Griffin and another man entered the apartment during the first set of murders, then drove away in Griffin's car, and returned to the apartment together immediately before Walker was murdered. These facts, combined with no evidence (apart from Griffin's presumed testimony) showing that Griffin attempted to disassociate himself from the crime or call the police, would have been severely damaging to a claim by Griffin that he was merely an innocent bystander. *See, e.g., Morgan*, 7 Ill.Dec. at 73, 364 N.E.2d at 60; *Davis*, 193 Ill.Dec. at 641, 626 N.E.2d at 1202 *Jones*, 12 Ill. App.3d 643, 299 N.E.2d 77. Moreover, the testimony identifying Griffin as one of the shooters would only have increased the likelihood of the jury finding him guilty of murder. *See, e.g., Davis*, 193 Ill.Dec. at 641, 626 N.E.2d at 1202 (finding some evidence that defendant may have actually shot at victim supported guilty verdict based on accountability theory).

Comparing the likelihood of success of the two defenses that were available to Goldenhersh, I cannot conclude that an unconflicted counsel would have presented the innocent bystander defense. Given the evidence in this case, Griffin was fighting an uphill, and ultimately losing, battle. Although the probability of a successful alibi defense appears close to nil, the likelihood of a successful innocent bystander defense was not significantly greater.[3] Griffin has therefore failed to demonstrate specific instances where an unconflicted counsel representing him would have acted differently.[4] Griffin cannot sus-

---

3. The majority distinguishes *Cole* as a case in which "the avenues of inquiry closed off by the joint representation were of little consequence." Maj. Op. at 889. Yet there is no reason to believe that Griffin's innocent bystander defense would have had a better chance of success than the potential defense that was foreclosed in *Cole*.

4. To support its finding of conflict, the majority also points to Goldenhersh's use of the scapegoat argument and his confusion of the defendants at trial. Although the scapegoat argument may have been unhelpful, and even prejudicial, to the defendants, it appears to have been the result of

tain his burden of demonstrating an actual conflict by showing that it was possible that Goldenhersh's·choice of the alibi defense was a product of divided loyalties. *See, e.g., Cirrincione,* 780 F.2d at 630–31 n. 4. For that reason, I have determined that Griffin's Petition for Writ of Habeas Corpus should not be granted.

bad trial strategy rather than any conflict of interest. Given the weakness of both of Griffin's potential defenses, Goldenhersh very likely would have made the same argument regardless of the defense chosen. Similarly, Goldenhersh's confusion of the two defendants and the evidence against each of them may exhibit incompetence, but it does not demonstrate a conflict of interest.

Griffin has not made a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), which provides relief for defendants who can demonstrate that their counsel's deficient performance prejudiced their defense.