NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 5, 2026

S25A1367.  DILLS v. WEAVER.

LAND, Justice.

Warden Allen Dills appeals the grant of a writ of habeas corpus to appellee Tamara Nicole Weaver, who was found guilty after a 2014 jury trial of two counts of cruelty to children in the first degree, two counts of cruelty to children in the second degree, three counts of aggravated battery, and three counts of aggravated assault in connection with the physical abuse of her infant son, K.W.[1]  In 2023, Weaver filed a petition for writ of habeas corpus, which was granted based on the habeas court's finding that her trial counsel provided her with ineffective assistance by operating under an actual conflict of interest arising from his previous representation of her then-

---

[1] In 2019, the Georgia Court of Appeals affirmed Weaver's convictions, and this Court denied certiorari review. *Weaver v. State*, 351 Ga. App. 167, 176 (2019), *cert. denied*, No. S19C1502 (Ga. Feb. 10, 2020).

husband and co-defendant, Michael Tyler, in the same case. Having reviewed the record, we affirm the habeas court's grant of relief.

1. *The underlying proceedings*

(a) *The trial evidence*[2]

In early 2013, Weaver had two sons, K.W. and a six-year-old. When K.W. was less than two months old, Weaver and her children moved in with Tyler.[3] Although K.W. slept in the same bedroom as Weaver and Tyler, he had his own bed. When he cried at night, Weaver took him out of the couple's room. When Weaver returned to work, her mother took care of K.W. Weaver, Tyler, and Weaver's mother were the baby's only caregivers.[4]

On March 6, 2013, when K.W. was almost three months old, Weaver took him to Scottish Rite children's hospital after she

---

[2] A more detailed recitation of the facts can be found in the Court of Appeals opinion affirming Weaver's convictions. See *Weaver*, 351 Ga. App. at 167–69.

[3] Tyler is not K.W.'s biological father. Tyler and Weaver were married sometime between March 6 and March 8, 2013, shortly after K.W.'s injuries were discovered during an emergency room visit, as discussed below.

[4] At trial, Weaver and Tyler stipulated that law enforcement had ruled out Weaver's mother as a suspect in the case.

became concerned by the infant's worsening fussiness, which she described as not "normal." At the hospital, x-rays ordered by a child abuse pediatrician revealed that K.W. had 16 bone fractures of varying ages. Genetic testing ruled out the possibility of brittle bone disease or other medical disorders that could have contributed to the fractures, and the pediatrician testified at trial that K.W.'s injuries were most consistent with physical abuse. Weaver told the hospital pediatrician and law enforcement that she did not know how K.W. had sustained his injuries and denied that anyone had hurt him. Meanwhile, Tyler told the pediatrician and law enforcement that Weaver was not getting much sleep, that Weaver was "cracking" due to K.W.'s crying and fussiness, and that Weaver "dealt with him," but had no explanation for K.W.'s injuries. In a forensic interview, Weaver's older son did not "disclose anything where he was being abused" or that he had witnessed any abuse of K.W. Weaver and Tyler were arrested on March 18, 2013.

On June 25, 2013, attorney Morris Fair entered an appearance on behalf of Tyler in connection with this case and filed a not guilty

plea.[5]  On December 4, 2013, a Spalding County grand jury indicted Weaver and Tyler for two counts of aggravated battery and two counts of cruelty to children (the "2013 Indictment").

On January 7, 2014, Fair again entered an appearance on behalf of Tyler in connection with the 2013 Indictment.  On January 24, 2014, Fair filed a general and special demurrer to the 2013 Indictment, though it is unclear from the record whether he filed it on behalf of Weaver, Tyler, or both.[6]  On February 19, 2014, the 2013 Indictment was nol prossed.  That same day, Pamela Stephenson, an attorney who shared office space with Fair, entered an appearance on behalf of Tyler in connection with the 2013 Indictment.

On March 12, 2014, a Spalding County grand jury returned an indictment charging Weaver and Tyler with two counts of cruelty to children in the first degree, two counts of cruelty to children in the

---

[5] Fair was disbarred in 2017 for reasons unrelated to this case.  See *In the Matter of Fair*, 300 Ga. 655 (2017).

[6] The record does not contain a copy of either demurrer or any entry of appearance by Fair for Weaver prior to the return of the March 12, 2014 indictment.

4

second degree, three counts of aggravated battery, and three counts of aggravated assault (the "2014 Indictment"). On April 16, 2014, Fair entered an appearance on behalf of Weaver and represented her throughout trial. That same day, Stephenson entered an appearance on behalf of Tyler and represented him throughout trial.[7]

Tyler and Weaver were tried jointly. At trial, neither Weaver nor Fair sought to blame Tyler for K.W.'s injuries despite the fact that the Scottish Rite pediatrician testified that K.W.'s injuries were consistent with abuse and the fact that Weaver and Tyler were the only two suspects. In her trial testimony, Weaver offered no alternative hypothesis for K.W.'s injuries, and she testified that she had no idea how her child was injured, or alternatively, that K.W. had not been injured at all and that the hospital may have made a "mistake."

Tyler testified that there were times that he took care of K.W.

---

[7] Stephenson died on June 17, 2024, prior to the hearing on Weaver's habeas petition.

alone when Weaver "went and got her nails done and things of that nature" but that he did not take care of K.W. when Weaver returned to work after K.W. was born. Tyler also testified that K.W.'s injuries were "unbelievable" and that "[i]t was something outside of abuse." Tyler denied harming K.W. himself and testified that he did not believe that Weaver had harmed K.W. either.

The detective who interviewed Tyler testified that Tyler stated during his interview that when K.W. cried, Weaver "dealt with him," that K.W.'s fussiness was "wearing [Weaver] down" and that Weaver was only getting "one to two hours" of sleep per night. The Scottish Rite pediatrician also testified that Tyler told him that Weaver was "cracking" due to lack of sleep and K.W.'s crying.

Weaver was found guilty of all charges while Tyler was found not guilty of all charges. On September 17, 2014, Fair filed a motion for new trial on Weaver's behalf. On June 23, 2017, attorney Ivar Lacis filed an amended motion for new trial. During the hearing on Weaver's motion for new trial, Fair testified that his trial strategy was that "it wasn't proven that [Weaver] was the one" who harmed

6

K.W.  After the hearing, the trial court denied Weaver's motion for new trial.

(b) *Direct appeal*

Lacis also represented Weaver in her direct appeal to the Court of Appeals. On direct appeal, Weaver enumerated five errors, two of which involved ineffective assistance of trial counsel claims: (1) that trial counsel rendered ineffective assistance by failing to move for the dismissal of the three counts of aggravated battery, and (2) that trial counsel rendered ineffective assistance by failing to object to the trial court's jury instruction for cases based on wholly circumstantial evidence.  Lacis raised no issue on appeal concerning Fair's conflict of interest in representing Weaver after having previously represented her co-defendant, Tyler. The Court of Appeals affirmed Weaver's convictions and sentences, and this Court denied certiorari review. See *Weaver*, 351 Ga. App. 167 (2019), cert. denied, No. S19C1502 (Ga. Feb. 10, 2020).

(c) *Habeas proceedings*

In 2023, represented by new counsel, Weaver filed the habeas

petition in this case, alleging, among other things, that Fair rendered ineffective assistance of counsel due to a conflict of interest stemming from his initial joint representation of both Weaver and Tyler. Although the record contains no entry of appearance that Fair filed on behalf of Weaver before April 16, 2014, Fair testified at the habeas hearing that he was retained by both Weaver and Tyler after their arrests on March 18, 2013. Fair testified that he met with Weaver and Tyler, filed a motion to get Weaver visitation of her son, and filed motions to modify both Weaver and Tyler's bond conditions. Fair admitted that he "may" have told Weaver and Tyler "at the start of the case" that he could represent both of them "as long as they were not pointing the finger at each other."

In December 2013 or January 2014, several months after Fair first entered an appearance on behalf of Tyler, Fair determined that Weaver and Tyler needed separate counsel. Fair testified that after conversations with Weaver about "potential defenses … [he] suggested that [Tyler] would probably need to get another attorney." When asked whether those "possible defenses … would have been

8

something that would have implicated Mr. Tyler," Fair answered, "yes."[8]

After deciding that Weaver and Tyler needed separate counsel, Fair met with the couple and suggested his office-mate, Stephenson, as the second attorney. When asked whether he advised Weaver that he would be unable "to investigate and present a case on Ms. Weaver's behalf that Mr. Tyler may have done this" due to his prior representation of Tyler, Fair answered, "No. I didn't say that was the situation at all." Fair admitted that he did not disclose any conflict of interest to Weaver, advise her of the risks associated with dual representation, advise her to consult independent counsel about the conflict, or obtain written consent to continue representing her. Fair testified that he had conversations with Weaver about arguing Tyler's guilt as an alternative theory, but that Weaver "would not even entertain" the possibility. Fair did not investigate Tyler's culpability or interview Weaver's older son.

---

[8] Despite his apparent recognition that Weaver and Tyler needed separate counsel, Fair continued to represent Weaver and filed a second entry of appearance for Tyler on January 7, 2014.

Fair testified that his defense theory at trial was that Weaver did not commit the acts that she was charged with and that she was a "loving mother" who took her child to the hospital. Fair testified that he "considered" making the argument that Tyler was guilty, but that Weaver "wanted to go with" a defense theory that K.W.'s injuries were accidental. When asked whether his defense was that someone other than Weaver harmed K.W., Fair stated "[o]r it was an accident" and that Weaver "possibly could have rolled on [K.W.] and could have caused the damage." However, Fair did not consult with any experts, did not remember whether he actually presented an accident defense at trial,[9] and conceded that rather than showing an accident had occurred, "[t]he medical evidence suggest[ed] that someone had beat the boy up."

When asked why he did not cross-examine Tyler at trial, Fair stated that Weaver and Tyler "both denied having any knowledge of what could have happened" to K.W., and that "based upon the

---

[9] The opening statements and closing arguments at trial were not transcribed, and the jury was not instructed on the defense of accident nor was such an instruction ever requested.

10

information that [Weaver] gave me," "there was no reason for me to cross-examine [Tyler], because I wasn't trying to point the finger at him." When asked whether he would have cross-examined Tyler if he gave "any testimony that [Fair] felt was damaging" to Weaver, Fair stated "[o]f course." Fair never explained how the decision not to blame Tyler in any way squared with his testimony that the medical evidence suggested that K.W. had been "beat" up, that Tyler was the only alternative suspect, and that his conversations with Weaver about possible defenses did in fact implicate Tyler.

During the evidentiary hearing on her habeas petition, Weaver testified that Tyler was verbally abusive toward her during their relationship.[10] After the couple was arrested in connection with K.W.'s injuries, Tyler became physically and sexually abusive toward Weaver and threatened to kill her if she left him. Weaver testified that her older son witnessed Tyler's abuse against her, that Tyler's family was "aware" of the abuse, and that she told a co-

---

[10] Fair conceded during the habeas hearing that if he had evidence that Weaver was being abused by Tyler, "that would have changed the nature of the case."

11

worker about the abuse. Weaver also testified that although she called the police about Tyler's abuse, Tyler was not arrested. Weaver stated that she testified during her trial that she did not believe that anyone had harmed K.W. because she "didn't want to believe" he had been abused.

With regard to Fair's representation, Weaver testified that she believed Fair was going to represent both her and Tyler, and that Fair never warned her about potential conflicts of interest or advised her to consult with another attorney about his representation of her. According to Weaver, Fair stated that "as long as nobody was pointing a finger at the other, then he could represent both of us." Weaver testified that although she told Fair she was "innocent," she did not remember telling Fair that she did not want to blame Tyler for K.W.'s injuries, and she specifically denied that Fair ever spoke with her about trial strategy. About two weeks before trial, Fair called Weaver and told her and Tyler that they "would need another attorney going into trial." Weaver testified that she, Tyler, and Fair all met with Stephenson, and that she left that meeting with the

impression that Stephenson would be representing her at trial. On the morning of trial, however, Weaver learned that Fair would remain her attorney.

Dr. Marti Loring, an expert witness in trauma and domestic violence, testified at the habeas hearing that she diagnosed Weaver with PTSD stemming from childhood abuse and her relationship with Tyler. Dr. Loring also testified that Weaver's PTSD manifested as passivity rather than aggression, that Weaver exhibited battered person syndrome and Stockholm Syndrome symptoms, and that her inability to recognize Tyler as K.W.'s abuser was consistent with PTSD and battered person syndrome. Dr. Loring further testified that there are behaviors common in child abusers, including intolerance for crying and a tendency to punish physically, and that Tyler's behaviors fit those criteria.

Weaver's appellate counsel, Ivars Lacis, who represented Weaver at the motion for new trial stage and on direct appeal, also testified at the habeas hearing. Lacis testified that he reviewed Fair's case file, including the entire trial transcript, but did not know

whether he reviewed the complete record in preparing Weaver's direct appeal. Lacis testified that he did not investigate Weaver's abuse allegations against Tyler. Lacis testified that he did not think that Fair's initial joint representation of Weaver and Tyler was unusual "because it's very common that people are charged jointly with a crime. They initially go to one attorney, and then the cases are farmed out" to conflict attorneys. Lacis admitted that he did not know that Fair had filed an entry of appearance on behalf of Tyler but that it did not change his analysis of whether that made Fair conflicted. When asked whether he looked into a conflict of interest involving Fair and Stephenson, Lacis stated that he determined that a conflict of interest claim did not have any merit because the two attorneys were unaffiliated. Lacis also testified that he did not see any issue in Fair not cross-examining Tyler at trial because he was cross-examined "extensively" by the State and he did not see "the point" of Fair asking the "same questions." However, Lacis conceded that there was a basis on which to argue Tyler's culpability as a reasonable alternative hypothesis.

In its order granting Weaver's petition, the habeas court found that Fair "originally represented both [Weaver] and [Tyler] during pretrial proceedings, without disclosing the obvious conflict" to Weaver, and that Fair "failed to advise [Weaver] of the risks associated with dual representation." The habeas court also found that Fair's prior attorney-client relationship with Tyler "prevented him from cross-examining" Tyler, who was the only remaining alternative suspect due to pretrial stipulations by the defendants. The habeas court further found that as a result of his conflict of interest, Fair was "unable" to pursue the theory that Tyler was guilty and was instead "confined to arguing that the treating physician at Scottish Rite Hospital had misdiagnosed [K.W.]'s injuries." The habeas court concluded that these constraints on Fair's representation "arose directly from counsel's conflict of interest due to his prior representation" of Tyler and "impaired his ability to zealously advocate" for Weaver at trial; accordingly, Fair's performance was adversely affected and Weaver established that there was a conflict of interest.

The habeas court rejected the Warden's argument that Weaver's claim is procedurally defaulted because she did not raise it on direct appeal, finding that Weaver's appellate counsel's "failure to raise the conflict-of-interest claim resulted from his own constitutionally deficient performance" because appellate counsel admitted that he "did not thoroughly review the record," relying solely on trial counsel's trial file, and that he was "unaware of the impropriety of dual representation, believing it to be common practice." The habeas court concluded that "[t]his ineffective assistance excuses any procedural default." Because the habeas court granted Weaver relief based on its finding that Fair's conflict of interest adversely affected his representation of Weaver, the habeas court granted Weaver's petition without addressing her remaining claims.

2. With respect to the issue of trial counsel's ineffectiveness arising from his conflict of interest, the Warden argues that the habeas court erred in granting Weaver habeas relief because Weaver has not shown that Fair's prior representation of Tyler

adversely affected his representation of Weaver. We disagree.

"When reviewing a habeas court's decision on a defendant's attorney conflict of interest claim, we accept the court's factual findings unless they are clearly erroneous, but we apply the law to those facts de novo." *Hall v. Jackson*, 310 Ga. 714, 719–20 (2021). "A habeas court's factual findings cannot be found to be clearly erroneous if there is evidence in the record to support such findings." *Smith v. Magnuson*, 297 Ga. 210, 212 (2015). "We also must yield to the judgment of the habeas court with respect to the credibility of witnesses who testified in the habeas proceedings." *Humphrey v. Walker*, 294 Ga. 855, 860 (2014). "[A] habeas court's determination regarding the presence or absence of an actual conflict of interest is a mixed question of fact and law which this Court reviews de novo." *Edwards v. Lewis*, 283 Ga. 345, 349–50 (2008). See also *Johnson v. State*, 305 Ga. 475, 477 (2019) ("Whether a conflict of interest denied a defendant his right to effective counsel is a mixed question of law and fact, and we review the questions of law involved de novo.").

"[F]or purposes of evaluating an ineffective assistance claim,

17

an actual conflict of interest means precisely a conflict *that affected counsel's performance* – as opposed to a mere theoretical division of loyalties." *Adams v. State*, 317 Ga. 342, 351 (2023) (cleaned up). "Prejudice is presumed if the defendant demonstrates that the conflict of interest existed and that it significantly affected counsel's performance." Id. at 352 (cleaned up). When evaluating a claim of ineffective assistance of counsel based on a conflict of interest, "[t]he critical question is whether the conflict significantly affected the *representation*, not whether it affected the outcome of the underlying *proceedings*." *Hall*, 310 Ga. at 720 (citation and punctuation omitted). "That is precisely the difference between ineffective assistance of counsel claims generally, where prejudice must be shown under the two-part test set forth in *Strickland v. Washington*, 466 US 668, 687 (1984), and ineffective assistance of counsel claims involving actual conflicts of interest, which require only a showing of a significant effect on the representation." Id. (cleaned up).

Joint representation alone does not amount to an actual

conflict of interest. See *Burns v. State*, 281 Ga. 338, 340 (2006). "A common defense often gives strength against a common attack," *Holloway v. Arkansas*, 435 US 475, 482–83 (1978), and "a mere failure to emphasize the different culpability of each co-defendant does not always and necessarily demonstrate an actual conflict." *Tolbert v. State*, 298 Ga. 147, 154 (2015). However, "[a] significant effect on the representation may be found, for example, where counsel is shown to have refrained from raising a potentially meritorious issue due to the conflict … or where one of the State's witnesses was a current client of defense counsel in an unrelated criminal matter, thereby constraining counsel's ability to cross-examine the witness." *State v. Abernathy*, 289 Ga. 603, 605 (2011).

This Court has previously held that "an actual conflict of interest adversely affect[s] the attorney's performance where counsel fail[s] to pursue an alternative defense theory that is more favorable to one defendant but which would have prejudiced a co-defendant by shifting blame to him." *Ellis v. State*, 272 Ga. 763, 766 (2000) (citation and punctuation omitted), overruled on other

grounds by *Alexander v. State*, 297 Ga. 59 (2015). See also *McFarland v. Yukins*, 356 F3d 688, 709 (6th Cir. 2004) (trial counsel who jointly represented co-defendants had actual conflict of interest where counsel ignored "obvious and strong" defense of inculpating co-defendant, who shared the apartment, as possessor of drugs, and instead implausibly argued that third parties possessed drugs); *Griffin v. McVicar,* 84 F3d 880, 888 (7th Cir. 1996) ("[C]ounsel may be ineffective if the joint representation precludes an obvious and viable alternative defense when the common defense is so completely untenable."); *United States v. Romero,* 780 F2d 981, 986–87 (11th Cir. 1986) (defense counsel's simultaneous representation of multiple co-defendants presented an actual conflict of interest where defendant had an "extremely feasible" blame-shifting defense that "was completely foreclosed to him because it would have implicated his codefendant and another client of his attorney").

Here, the habeas court found that Fair's joint representation of Tyler and Weaver in pretrial proceedings (more specifically, his prior representation of Tyler in this case) prevented him from cross-

examining Tyler at trial and made him unable to argue that Tyler was the real culprit. Accordingly, the habeas court concluded that Fair's conflict of interest "impaired his ability to zealously advocate" for Weaver at trial. Viewing the evidence in the light most favorable to that determination, the record supports the habeas court's finding that Fair's conflict of interest affected his performance as Weaver's trial counsel and caused him not to pursue an alternative defense theory that would have been favorable to Weaver but unfavorable to Tyler.

Fair conceded at the habeas hearing that medical evidence showed that K.W. was "beat" up and that the only alternative suspect was Tyler. Given this concession, which the habeas court was authorized to—and at least implicitly did—credit, it is inexplicable that, as a matter of trial strategy, conflict-free counsel would have failed to blame, or even investigate, Tyler in any way. See *State v. Mamedov*, 288 Ga. 858, 861 (2011) (concluding that if trial counsel had "been retained and paid" by appellant alone, conflict-free counsel "would at the very least have… considered" an

21

alternative defense theory on appellant's behalf). Moreover, Fair conceded that he represented both Weaver and Tyler for several months before determining that they needed separate counsel due to conversations with Weaver about potential defenses *that implicated Tyler*. Thus, Fair recognized that there was a potential conflict of interest arising from his prior representation of Tyler, and his testimony confirms that Weaver had a potentially meritorious defense that he did not pursue or even investigate.

We reject the Warden's argument that Fair's abandonment of Weaver's alternative defense without any investigation did not result from his divided loyalties but instead from Weaver's instructions regarding trial strategy. As an initial matter, Weaver denied having any recollection of discussions with Fair concerning her alleged desire not to blame Tyler, and she expressly denied having any conversations with Fair regarding trial strategy. Even though Fair provided contrary testimony, the evidence was in conflict on this issue, and the habeas court's order implicitly found Fair less credible than Weaver. Because the evidence was in conflict,

the habeas judge was authorized to discredit Fair's explanation. See *Harris v. Upton*, 292 Ga. 491, 496 (2013) ("A habeas judge sits as the trier of facts and may reject the testimony of a witness in whole or in part").

In addition, the habeas court had other reasons to question Fair's credibility and to discredit his testimony. Specifically, Fair testified that after consultation with Weaver, he decided to pursue an accident defense, suggesting that K.W.'s injuries might have been caused by co-sleeping. However, there is nothing in the record to support Fair's assertion that he actually pursued this defense at trial. Weaver did not testify that K.W. slept in her bed or that she may have accidentally injured him but instead testified that she believed doctors may have made a "mistake" when they diagnosed K.W.'s injuries. In addition, at the hearing on Weaver's motion for new trial, Fair confirmed that his trial strategy was simply that "it wasn't proven that [Weaver] was the one" who harmed K.W. In short, Fair's testimony that he decided to pursue an accident defense is not supported by the record.

23

Given the conflicting evidence and the doubts that were cast upon Fair's credibility at the habeas hearing, the habeas court was authorized to reject his testimony, credit Weaver's testimony that Fair did not talk with her about trial strategy, and find, as it did, that Fair's representation of Weaver was adversely affected by his prior representation of Tyler. See *Harris*, 292 Ga. at 496.

Thus, viewing the evidentiary record in the light most favorable to the habeas court's finding that Weaver's trial counsel had a conflict of interest that prevented him from cross-examining or blaming Tyler for K.W.'s injuries, see *Tolbert*, 298 Ga. at 154 n.8, we conclude that the habeas court did not err in granting relief on the basis that this conflict of interest adversely affected trial counsel's performance. See *Hall*, 310 Ga. at 723 (affirming habeas court's grant of relief where evidence failed to show that counsel's actions were the result of strategic decision but instead supported finding that counsel's performance was adversely affected by conflict of interest); *Mamedov*, 288 Ga. at 860-61 (no error in habeas court's finding of an actual conflict of interest that adversely affected

24

counsel's performance where trial counsel, who jointly represented Mamedov and his co-defendant, failed to pursue or even consider an alternative defense theory on behalf of Mamedov and instead testified that he believed Mamedov "had no defense").

3.    The Warden argues that Weaver's claim that her trial counsel was ineffective due to his conflict of interest is procedurally barred since that claim was not asserted in her direct appeal and that the habeas court erred in finding otherwise. In support of this argument, the Warden argues that the habeas court erred in finding that Weaver's appellate counsel's failure to raise this issue in Weaver's direct appeal was deficient, and that the habeas court failed to consider whether Weaver was prejudiced by that deficient performance. For the following reasons, these claims fail.

"Georgia law directs habeas courts to consider whether a petitioner has complied with Georgia procedural rules at trial and on appeal and further provides that absent a showing of cause for noncompliance with such requirement, and of actual prejudice, habeas corpus relief shall not be granted." *Chatman v. Mancill*, 278

Ga. 488, 489 (2004) (citation and punctuation omitted); OCGA § 9-14-48(d). Because Weaver did not raise the issue of trial counsel ineffectiveness based on conflict of interest in her direct appeal, the habeas court could consider her claim "only if the 'cause and prejudice' test is satisfied or in order to avoid a miscarriage of justice where there has been a substantial denial of constitutional rights." *Chatman*, 278 Ga. at 489. The cause and prejudice test can be met by showing that appellate counsel was constitutionally ineffective for failing to raise a claim on direct appeal. See *Humphrey*, 294 Ga. at 858 ("A common method of satisfying the cause and prejudice test is to show that trial and direct appeal counsel rendered ineffective assistance[.]") (citation and punctuation omitted).

"[W]here the alleged ineffective assistance of *appellate* counsel is premised upon the failure to raise ineffective assistance of *trial* counsel on direct appeal, two layers of fact and law are involved in the analysis of the habeas court's decision." *Gramiak v. Beasley*, 304 Ga. 512, 513 (2018).

To find that appellate counsel provided ineffective

26

assistance, a reviewing court must find appellate counsel's failure to raise trial counsel's ineffectiveness on appeal represents deficient professional conduct. Even if deficient performance of appellate counsel is shown, a demonstration of prejudice requires a showing that, had the ineffective assistance of trial counsel been raised on direct appeal, a reasonable probability exists that the outcome of the appeal would have been different.

Id.

Thus, to prevail on her claim that appellate counsel's failure to raise the issue of trial counsel's conflict of interest on appeal establishes ineffective assistance of appellate counsel, Weaver must "demonstrate that this omission represents deficient professional conduct—that is, that it was outside the wide range of professionally competent assistance." *Gramiak*, 304 Ga. at 521 (citation and punctuation omitted). "[R]egardless of the relative strengths and weaknesses of the errors actually enumerated in the appeal and those not raised, the controlling principle is whether appellate counsel's decision was a reasonable tactical move which any competent attorney in the same situation would have made." *Sullivan v. Kemp*, 293 Ga. 770, 774 (2013) (citation and punctuation omitted).

"[I]t is the attorney's decision as to what issues should be raised on appeal, and that decision, like other strategic decisions of the attorney, is presumptively correct absent a showing to the contrary by the defendant." *Hooks v. Walley*, 299 Ga. 589, 591 (2016) (citation and punctuation omitted). However, "[a] lawyer's failure to raise a claim on appeal might be unreasonable if that claim had clear and strong merit under the law as it existed at the time of the appeal," *Benton v. Hines*, 306 Ga. 722, 724 (2019) (citation and punctuation omitted), and a failure to raise a claim on appeal that is "based upon [a] lack of understanding of or familiarity with the relevant law" is not strategic. *Sullivan*, 293 Ga. at 774. See also *Barker v. Barrow*, 290 Ga. 711, 712 (2012) (the reasonableness of appellate counsel's conduct "is assessed from the perspective of counsel at the time of … appeal and under the specific circumstances of the case"). Because "[a]n ineffective assistance claim presents a mixed question of fact and law … we accept the habeas court's findings of fact unless clearly erroneous but independently apply those facts to the law." *Brown v. Baskin*, 286 Ga. 681, 684 (2010) (citation and punctuation

28

omitted).

Here, appellate counsel testified at the habeas hearing that he did not review the complete court record in preparing Weaver's direct appeal and was unaware of the extent of Fair's prior representation of Tyler. Despite being unaware of the extent of Fair's prior representation of Tyler, appellate counsel testified that Fair's initial joint representation of Weaver and Tyler was "common" and conducted no further investigation into whether it was improper. Appellate counsel also testified that he determined a conflict of interest claim would not have any merit because the two attorneys involved in the case, Fair and Stephenson, were unaffiliated, a determination separate from whether Fair's prior representation of Tyler created a conflict of interest that adversely affected his representation of Weaver. Appellate counsel also admitted that he did not investigate Weaver's abuse allegations and that he did not see "the point" of Fair cross-examining Tyler at trial because he was cross-examined by the State.

Based on the above, it is apparent that appellate counsel did

29

not make a strategic decision to omit the conflict of interest claim from Weaver's direct appeal. Rather, the evidence supports the conclusion that the failure to raise this claim resulted from counsel's misunderstanding of the relevant law and lack of appreciation for the fact that the claim was meritorious; thus, appellate counsel's actions fell below an objective standard of reasonableness. See *Sullivan v. Kemp*, 293 Ga. 770, 774 (2013) (concluding that appellate counsel's failure to raise claim on direct appeal "fell below an objective standard of reasonableness and establishe[d] [that] appellate counsel's performance was deficient").

We reject appellate counsel's contention that Fair had no conflict of interest under the circumstances of this case, a position that is refuted by controlling precedent. The evidence in the case showed that K.W. was abused and that the only suspects were Tyler and Weaver. Thus, Weaver was entitled to have conflict-free counsel that was not constrained in his ability to advocate for her by placing blame on Tyler. However, as the habeas court found, Fair was not that counsel. Due to his prior representation of Tyler, Fair had a

conflict of interest that prevented him from taking any action adverse to Tyler's interests, and this conflict adversely affected his representation of Weaver.

Because Fair had previously represented Tyler in connection with this case, he was ethically precluded under the Rules of Professional Conduct from taking any action that would place the blame on Tyler for K.W.'s injuries. See Georgia Rule of Professional Conduct 1.9(a) ("[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former gives informed consent, confirmed in writing"); Georgia Rule of Professional Conduct 1.9(c)(1) ("[a] lawyer who has formerly represented a client in a matter … shall not thereafter … use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known").

31

Given these facts, the evidence showing K.W. was abused, and the parties' stipulation at trial that Weaver and Tyler were the only suspects, the habeas court did not err in concluding that Weaver's appellate counsel rendered deficient performance by failing to raise the meritorious issue of her trial counsel's conflict of interest during the direct appeal. See *Brown*, 286 Ga. at 683 (habeas court did not err in finding that appellate counsel performed deficiently by failing to raise meritorious issue on direct appeal).

Having concluded that the habeas court did not err in finding that appellate counsel performed deficiently, we turn next to the Warden's argument that the habeas court did not consider whether Weaver was prejudiced by that deficient performance. In order to show that she was prejudiced by her appellate counsel's deficient performance, Weaver had to show that the result of her appeal would have been different had appellate counsel raised the issue of trial counsel's conflict of interest. See *Humphrey v. Lewis*, 291 Ga. 202, 211 (2012) ("In order to establish the prejudice prong of an ineffective assistance of *appellate* counsel claim, the petitioner must

show a reasonable probability that the outcome of the *appeal* would have been different.") (cleaned up), overruled on other grounds by *State v. Lane*, 308 Ga. 10 (2020).

Because the habeas court found that Weaver's underlying conflict of interest claim was in fact meritorious, it logically follows that it concluded that Weaver would have prevailed in her appeal had this issue been raised. The habeas court's conclusion that this claim has merit and that Weaver has overcome the procedural default is an implicit finding that Weaver has shown she was prejudiced by her appellate counsel's deficient performance. Accordingly, we reject the Warden's argument that the habeas court failed to address the issue of prejudice.

With respect to whether Weaver was in fact prejudiced by her appellate counsel's deficient performance, the Warden argues that she was not. We disagree. As explained in Division 2 above, we reject the Warden's argument on the merits of the underlying conflict of interest claim. As discussed in detail in that Division, the record supports the habeas court's finding that trial counsel had a conflict

of interest that adversely affected his representation of Weaver and that trial counsel rendered ineffective assistance of counsel as a result. Thus, Weaver's appellate counsel's failure to raise that meritorious issue during the direct appeal prejudiced her because there is a reasonable probability that the outcome of the appeal would have been different had such a claim been raised. See *Humphrey*, 291 Ga. at 211. Accordingly, Weaver has met the cause and prejudice test necessary to overcome the procedural default. See *Humphrey*, 294 Ga. at 858.

For the foregoing reasons, we affirm the habeas court's grant of relief to Weaver. Due to her trial counsel's ineffective assistance of counsel arising from his conflict of interest and her appellate counsel's ineffective assistance of counsel arising from his failure to raise this issue during her direct appeal, the habeas court's grant of a new trial is fully supported by the record and the controlling law.

*Judgment affirmed. All the Justices concur.*